**FILED**

Jeanne A. Naughton, CLERK

**Feb. 8, 2017**

U.S. BANKRUPTCY COURT
NEWARK, N.J.

BY: s/ Margaret Cohen
JUDICIAL ASSISTANT

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

In Re:

**STEWART AND SAMANTHA KENNEDY,**

Debtors.

Case No.:   10-24535 (VFP)

**FRANK RUIZ,**

Plaintiff,

v.

**STEWART AND SAMANTHA KENNEDY,**

Defendants.

Adv. No.:   10-02633 (VFP)

**JOHN LIRA,**

Plaintiff,

v.

**STEWART AND SAMANTHA KENNEDY,**

Defendants.

Adv. No.   10-02634 (VFP)

**LAILA CRISTOBAL,**

                                Plaintiff,                    Adv. No.   10-02635 (VFP)

v.

**STEWART AND SAMANTHA KENNEDY,**

                                Defendants.

## OPINION

**APPEARANCES:**

Thomas J. Romans, Esq.
27 Warren Street
Suite 103
Hackensack, New Jersey 07601
*Attorney for Plaintiffs*
*Frank Ruiz, Laila Cristobal,*
*and John Lira*

Santo J. Bonanno, Esq.
1430 Route 23 North
Wayne, New Jersey 07470
*Attorney for Debtors and Defendants*
*Stewart and Samantha Kennedy*

### THE HONORABLE VINCENT F. PAPALIA, U.S.B.J.

This matter is before the Court following a consolidated trial of three adversary

proceedings by plaintiffs challenging the rights of Stewart and Samantha Kennedy (the

"Debtors") to discharge their debts under chapter 7 of the Bankruptcy Code.  Laila Cristobal

("Cristobal"), Frank Ruiz ("Ruiz"), and John Lira ("Lira") and, together with Ruiz and Cristobal,

the "Plaintiffs") also assert that the Debtors' obligations to them are nondischargeable under 11

U.S.C. § 523(a) because they were incurred by way of fraud, false pretenses or embezzlement.

Cristobal, Lira and Ruiz (at least initially) further asserted that the Debtors are not entitled to a

discharge under 11 U.S.C. § 727(a) because they fraudulently failed to disclose assets in their

bankruptcy petition, made unauthorized post-petition transfers of property, made false oaths in connection with the case, and failed to properly maintain and destroyed records from which their financial dealings can be ascertained.[1]

As set forth below, the Court will enter judgment denying Stewart Kennedy's discharge pursuant to sections 727(a)(2), (a)(3), (a)(4) and (a)(7).  Judgment denying Samantha Kennedy's discharge under sections 727(a)(3), (a)(4) and (a)(7) will also be entered.  Because this Court has determined that Mr. and Mrs. Kennedy are not entitled to a discharge, it is not technically necessary to decide whether any of Plaintiffs' individual claims are nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (4) or (6), except to the extent that (i) the Plaintiffs seek a determination as to the amount of their claims; and (ii) the Kennedys have asserted that Lira released his claims against them.  Cristobal's claim against Mr. and Mrs. Kennedy is determined to be in the amount of $155,037, plus legal interest from January 1, 2012 going forward.  Ruiz's claim against Mr. Kennedy is determined to be in the amount of $503,101, plus legal interest from January 1, 2014 going forward.  The Court further determines that Ruiz has no claims against Mrs. Kennedy, who was not directly or indirectly involved in the loans and transactions between Ruiz and Mr. Kennedy.  Lira's causes of action under section 523(a) will be dismissed since his claims against the Kennedys are barred by a release dated October 29, 2007 and for the other reasons set forth in this Opinion.

## JURISDICTION

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a), and the Standing Order of Reference from the United States District Court

---

[1] (Frank Ruiz Compl., Adv. No. 10-02633); (John Lira Compl., Adv. No. 10-2634); (Laila Cristobal Compl., Adv. No. 10-02635).  Ruiz ultimately agreed to voluntarily dismiss his section 727 claims against the Debtors. See Adv. No. 10-02633, ECF No. 53, Plaintiffs' Post-Trial Summation and Br. at 1.   Plaintiffs' section 523(a)(4) (embezzlement or defalcation while acting in a fiduciary capacity) and section 523(a)(6) (willful and malicious injury) claims against Mrs. Kennedy and the section 727(a)(2) claims by Cristobal and Lira against Mrs. Kennedy were dismissed by Judge Steckroth at the close of Plaintiffs' case on April 17, 2014.  (Trial Tr. 173:18-174:15).  The motion to dismiss the claims against Mr. Kennedy made at the same time was denied in all respects. *Id*. at 174:16-23.

for the District of New Jersey.  This matter is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2)(I) (determination as to dischargeability of certain debts) and (J) (objections to

discharge).  Venue is proper under 28 U.S.C. §§ 1408 and 1409(a).  The following constitutes

the Court's findings of fact and conclusions of law pursuant to FEDERAL RULE OF BANKRUPTCY

PROCEDURE 7052.

## FACTS AND PROCEDURAL HISTORY

### I.    Overview of Debtors' Business

On May 12, 2010, the Debtors filed a joint petition under chapter 7 of the Bankruptcy

Code.  The petition listed assets of $239,000 and debts of $8,662,387, approximately three

million of which was scheduled as secured.[2]  Although the petition states that the Debtors'

obligations consisted primarily of consumer debts, the vast majority of this debt was in fact

incurred in connection with their various real estate ventures.

In the late 1990s, Mr. Kennedy, then a full-time detective sergeant for the City of Passaic

Police Department, began acquiring properties at foreclosure sales with his friend Danny Colon,

rehabilitating them, and selling them for profit.[3]  The business was funded through mortgage and

construction loans from banks and institutional lenders, as well as friends, relatives or colleagues

of the Debtors.  Due to Mr. Kennedy's previous bankruptcy filing and poor credit, many of these

properties were financed and titled in Mrs. Kennedy's name, with her knowledge and consent.[4]

Mrs. Kennedy would participate in loan and mortgage closings when necessary, but gave her

husband unlimited authority to sign her name on documents and checks in connection with the

business.[5] The Debtors considered themselves partners in the business.[6]

---

[2] (Case No. 10-24535, Pet. and Am. Schedules, ECF Nos. 1, 7, 43, 48, 58, 69, 92, 107, 117).
[3] (Trial Tr. 5:18-6:3, June 12, 2015).
[4] (Trial Tr. 65-67, Apr. 17, 2014) (quoting from deposition); (Trial Tr. 25:19-21, June 10, 2015); (cross-examination of Samantha Kennedy) (Trial Tr. 27:6-15, June 10, 2015); (Danny Colon Trial Tr. 85:8-16, Apr. 17, 2014).  See also ECF No. 54, Defendants' Post-Trial Summation at 2.  ("Because of a previous bankruptcy filing and a poor credit rating, [Mr. Kennedy] put many of the properties and contracts in the name of his wife, Samantha").
[5] (Trial Tr. 25:13-21; 27:6-28:1; June 10, 2015).

In the years leading up to the filing of their petition, the real estate business expanded and, at times, appeared to thrive. Mr. Kennedy participated in the purchase and rehabilitation of thirty to forty properties, ranging from single-family homes to an eighty-three-unit condominium complex at 447 Van Houten Avenue in Passaic. Some of these properties were developed by entities in which one of the Kennedys held an interest, including:

- **447 Van Houten, LLC**: eighty-three-unit condominium complex at 447 Van Houten Avenue in Passaic. Owned in equal one-third shares by Mrs. Kennedy, John Lira and Suzette Colon.[7]

- **DCL, LLC**: twelve-townhome development on Lafayette Street in Passaic. Mrs. Kennedy owned a twenty-five percent interest.[8]

- **Lircostew, LLC**: owned in equal shares by Mr. Kennedy and Lira to develop various properties in Passaic.

Although these entities were not listed in the Debtors' petition, they were added in a January 2011 amendment which also included entities known as: Shannon G, LLC, GGL Capital, and Bella Vista Estates.[9] Mr. Kennedy had exclusive control over the checking accounts for 447 Van Houten, LLC and Lircostew, LLC and was a dual signatory on the DCL, LLC checking account with Michael Simone, another owner.[10]

In addition to the properties owned by the above-mentioned entities, Mr. or Mrs. Kennedy acquired real estate in their individual capacity, owning certain properties outright (such as their home in Wayne) or through informal partnerships with others, such as their shore house in Ocean Gate, New Jersey. Loans and investments in the properties were administered through the Debtors' personal bank accounts with Valley National Bank.[11] The Debtors

---

[6] (See, e.g., Trial Tr. 27:16-18, June 10, 2015).

[7] (Trial Tr. 42:14-22, June 12, 2015 (referring to ninety-three units); Trial Tr. 135:2-20, June 15, 2015). Suzette Colon was Danny Colon's wife.

[8] (*Id*. at 75:3-4). Mark Casamassina, Michael Simone, and Joseph Simone owned the remaining interests. DCL stood for "Deputy Chief Lira."

[9] (Am. Schedules, ECF No. 69).

[10] (Trial Tr. 11:6-10; 75:3-10, June 12, 2015). Banking records for DCL were maintained by Michael Simone.

[11] (See Trial Tr. 11:6-10; 18:11-19; Sept. 23, 2015).

deposited all such investments into a joint personal account in both of their names until November 2005, when they opened a joint business account using the trade name "S&S Development" at the request of the bank.[12]   From April 2006 to May 2010, approximately $2,286,950 was deposited into the S&S Development account, which was used in connection with at least sixteen properties in Passaic[13] and to pay personal expenses of the Kennedys.  No funds were left in this account on the petition date.[14] Although Mrs. Kennedy testified repeatedly that she had no access to and did not use or write checks from the S&S Development account (or its predecessor account), and that the account was used only for business purposes, cross-examination revealed that the S&S Development account was used to pay personal expenses of the Kennedys and that Mrs. Kennedy wrote at least some of the checks from that account.[15]

Although he was in charge of the financial aspects of S&S Development, 447 Van Houten, and Lircostew and controlled their bank accounts, Mr. Kennedy testified that he did not maintain any records for these businesses other than copies of checks and check registers.  These were generally kept in the trunk of his car, which he testified enabled him to visit and pay contractors at various construction sites in Passaic.[16]  Kennedy's method of record-keeping was as follows: upon writing a check for a certain expense, he would typically record what the check was for in the "memo" space on the check and make an accompanying notation in the checkbook register.[17]  But this method was far from perfect and many checks and entries in the checkbook register were not accompanied by notations and some of the notations were inconsistent with the

---

[12] (See Trial Tr. 10:3-13, Sept. 23, 2015).
[13] (See Trial Tr. 46:4-11; 47:19-21, Sept. 23, 2015); (P-49).  These properties included: 127 Linden Street; 271 Third Street; 382 Highland Avenue; 171 Burgess Street; 243 Third Street; 34 Central Avenue; 169 Passaic Street; 267 Howard Street; 199 Lafayette Street; 167 Burgess Place; 165 Passaic Street; 155 Howard Avenue; 154 Broadway; 70-72 Palmer Street; 228 Autumn Street; and 230 Autumn Street.  (See Trial Tr. 16:14-17:13, Sept. 23, 2015).
[14]  (Trial Tr. 48:2-7, Sept. 23, 2015).
[15]  (Trial Tr. 26:16-27:5; 28:20-22; 29:25-30:23; 40:22-42:7 (P-49); 43:12-45:7; 45:8-24; 49:13-25; 52:25 (P-72); 55:13-62:7 (P-78 and 77); 63:2-67:1, June 10, 2015).
[16] (See Trial Tr. 19:8-20; 19:24-20:11, Sept. 23, 2015); (Trial Tr. 74:14-15, June 12, 2015).
[17] (Trial Tr. 64:12-23, June 12, 2015); (Trial Tr. 93:24-25; 94:1-2, Sept. 23, 2015).

check-cashing information on the back of the checks and the testimony of third parties, as is explained in more detail below. Due to, at least in part, this sloppy and incomplete record-keeping, the Debtors did not file tax returns in the six years that preceded the filing of the petition. This is another example of the Debtors' -- and particularly Mr. Kennedy's -- inadequate and unsatisfactory record-keeping.

Mr. Kennedy also did not employ any mechanism for tracking or allocating expenses among different projects. Adding to the confusion, he and Mrs. Kennedy commingled business and personal expenses in the S&S Development account, as was noted above. Of the $2,286,950.27 deposited into the S&S Development account between April 2005 and May 2010, $438,430 came from the Kennedys' personal funds. However, during the same period approximately $859,463 of S&S Development funds -- some $400,000 more than the Kennedys' deposits -- were devoted to the Kennedys' personal expenses, including, among other things, $321,244 on renovations to their home, $58,700 on jewelry, and $62,321 on their beach house.[18] As was also noted above, while Mrs. Kennedy had little direct involvement in the real estate business, she regularly used the S&S Development account to pay personal expenses.[19]

The Plaintiffs filed separate adversary proceedings against the Debtors in December 2010.[20] Around the same time, the Plaintiffs served the Debtors with a Rule 2004 subpoena requesting all business and property records related to their real estate businesses. Although Mr. Kennedy later testified that he had many of these records at the time, the Debtors ultimately (and belatedly) responded to the subpoena requests by indicating that the records had been turned over to their accountant so that he could complete their tax returns, which had not been filed since

---

[18] (P-63); (Trial Tr. 98:2-24, Mar. 7, 2014); (Trial Tr. 71:12-16, June 10, 2015).

[19] Although Mr. Kennedy apparently wrote all business-related checks from these accounts, Mrs. Kennedy wrote a $5,000 check on the 447 Van Houten account (see P-70), and testified that she used the S&S Development account to write checks for personal expenses. (Trial Tr. 101:7-17, June 10, 2015).

[20] *See Ruiz v. Kennedy*, Adv. No. 10-02633; *Lira v. Kennedy*, Adv. No. 10-02634; *Cristobal v. Kennedy*, Adv. No. 10-02635). The Debtors scheduled Cristobal and Lira's claims at $300,000. Ruiz's secured claim was scheduled at $100,000.

2004.[21]  The tax returns were filed in 2013 and the records were returned to the Debtors by their accountant.  However, Mr. Kennedy testified (on the June 12, 2015 trial day) that after receiving the records from his accountant, he threw out or destroyed *all* those records.[22]  Then, on June 15, 2015, the very next day of trial, Mr. Kennedy and his counsel announced that Mr. Kennedy had located a notebook and/or check register "three or four months" earlier, and was producing it that day to refresh his recollection as to certain matters.[23]

The record also reflects that the Kennedys produced virtually nothing in response to Plaintiffs' discovery requests, except certain foreclosure complaints and then, much belatedly, the check register at trial.  As a result, Plaintiffs were forced to attempt to reconstruct the Kennedys' financial affairs and records by subpoenas to third parties, the testimony and other evidence provided by the Kennedys' accountant and, ultimately, the testimony of the Kennedys themselves.  But even the Kennedys' own accountant was unable to prepare complete financial statements for S&S Development because of the Debtors' deficient record-keeping.[24]

## II.    Cristobal Complaint

Laila Cristobal worked as a police officer for the City of Passaic with Mr. Kennedy, who was her front-line supervisor.  Mr. Kennedy regularly conducted business in the police station and would often speak of the success of his real estate business and the luxurious homes, cars, and vacations it enabled him to enjoy.  In July 2004, after an inquiry from Cristobal as to whether she could invest with him, Kennedy invited Cristobal to participate in a project at 70-72 Palmer Street in Passaic ("Palmer Street").  Kennedy told her that a construction loan was

---

[21] (Trial Tr. 9:3-18, Sept. 23, 2015)
[22] (Trial Tr. 63:20-64:8; 65:10-15, June 12, 2015).
[23] (Trial Tr. 102:1-21, June 15, 2015).
[24] (See, e.g., P-49, noting of various points that source as "unknown" and "need"); (P-63); (Trial Tr. 93:1-94:9, Sept. 23, 2015).

needed to complete the project, which involved the construction of two duplex homes, and that

he had already located buyers to purchase the units for $550,000 each.[25]

Cristobal told Kennedy that she would be able to loan him up to $150,000 for the

development of Palmer Street by taking out a second mortgage on her home.  Kennedy told her

that her investment would be repaid in one year, with $35,000 in interest, and asked her to write

a check out to Samantha Kennedy.[26]  Kennedy explained that this was necessary because he and

Mrs. Kennedy, along with Danny and Suzette Colon, owned the company behind the real estate

project.[27]  The loan was to be used to complete the construction on the Palmer Street property.[28]

On August 1, 2004, Cristobal brought a $150,000 check payable to Mr. and Mrs.

Kennedy to the police department headquarters, which was funded by a $150,000 line of credit

in Cristobal's name, secured by a mortgage on her home.[29]  Mrs. Kennedy subsequently

deposited that check into the Debtors' joint account at Valley National Bank (No. 83359656).

That check was dishonored for an unexplained reason and replaced by a bank teller's check

dated August 31, 2004.[30]  In return, Cristobal received a $150,000 mortgage note, upon which

Kennedy signed his wife's name.[31]  Although the note stated that a mortgage on Palmer Street

was being given to Cristobal, and Kennedy assured her that her loan would be secured by a

mortgage and that she did not need a lawyer, no mortgage in favor of Cristobal was ever

---

[25] (Trial Tr. 132-136, Nov. 14, 2013; Trial Tr. 142:12-143:17, June 15, 2015).
[26] (*Id.* at 135:6-25; 141:10-142:10, Nov. 14, 2013) (P-27).
[27] (Trial Tr. 135:5-20, June 15, 2015); (*Id.* at 141:22-25, Nov. 14, 2013).  When Cristobal and Kennedy first began discussing an investment in Palmer Street, the property was owned in equal fifty percent shares by Mrs. Kennedy and Suzette Colon.  Unbeknownst to Cristobal, on July 30, 2004, two days before she brought her $150,000 check to the police station, 70 Palmer Street was sold to third-party purchasers, Anacony and Cathy Morales for $470,000. (See P-32, Deed dated July 30, 2004 and recorded August 18, 2004).
[28] (Trial Tr. 135:6-136:10, Nov. 14, 2003).
[29] (Trial Tr. 131:14-132:8, June 15, 2015; *Id.* at 142:3-22; 144:2-145:6, Nov. 14, 2013).
[30] (P-26, check and related bank statement).
[31] (P-27). (Trial Tr. 149:21-150:6; June 15, 2015).

recorded against the property.[32]  Cristobal testified that she did not understand mortgages well and that she believed the note itself to be a mortgage.[33]

Despite the representations that Cristobal's loan would be used for the Palmer Street property, Plaintiffs' analysis of the Debtors' account with Valley National Bank shows that in the two weeks after the loan was made, none of it was spent on Palmer Street.[34]  Instead, it was used to cover the then overdrawn status of the Kennedys' account (by $12,835.33) and pay various other unrelated expenses, including $13,568.49 for a project at 6 Jackson Street in Passaic, $150 for the Kennedys' personal residence, and $560 on a loan to a business associate of the Kennedys.[35]  Tracing the use of the funds beyond this two-week period was not possible because additional funds were deposited into the Debtors' bank account and they maintained no other records.

The following colloquy between the Court and Cristobal summarizes her case under section 523(a)(2) and confirms that Cristobal made the $150,000 loan in 2004 on the basis of the representations of Mr. Kennedy:

> THE COURT: I understand your testimony to be that you lent the money at the request of Mr. Kennedy to be used to rehabilitate or develop Palmer Street, correct?
>
> THE WITNESS: Yes.
>
> THE COURT: Would you have lent the money if any of that money is going to be used for any other expense?
>
> THE WITNESS: No.
>
> THE COURT: And you relied upon him when you lent the money?
>
> THE WITNESS: Yes.

---

[32] (Trial Tr. 134:2-135:20, June 15, 2015).
[33] (Trial Tr. 142:25-144:20, Nov. 14, 2013).
[34] (P-29). (Trial Tr. 123-125, Mar. 7, 2014).
[35] *Id*.

THE COURT: Would you have lent the money if you knew that he was going to write a check to the Colons?

THE WITNESS: No.

THE COURT: Would you have lent the money if you knew any of those funds was going to be spent for personal expenses of the Kennedys?

THE WITNESS: No.

THE COURT: Would you have lent the money if you knew any of those funds were going to be used for anything other than the rehabilitation of Palmer Street?

THE WITNESS: No.

THE COURT: All right. And just so I'm clear, when you spoke with Mr. Kennedy, and he indicated he had, you know, a project and he needed some funding for it, on Palmer Street, did he say at any time to you that look, some of these monies may be used on some other project I'm behind on?

THE WITNESS: No.

THE COURT: Or pay for my leases on my Cadillacs, did he say anything like that?

THE WITNESS: No.[36]

After a year passed and she had not yet received any payments of principal or interest, Cristobal began making inquiries of Mr. Kennedy as to repayment. Although Kennedy assured her that her loan was secured and that she would be repaid, more time passed without any payments. The urgency of Cristobal's inquiries intensified in 2007 when the interest rate on her mortgage increased and she left work on maternity leave. Mr. Kennedy made further assurances she would be repaid and attempted to allay her concerns by giving her a series of checks between June and November 2008 in the total amount of $12,500. Cristobal was also put in contact with the Debtors' attorney, Stephen Gruhin, and was assured that a sale of Palmer Street was

---

[36] (Trial Tr. 36:25-38:7, Nov. 15, 2013).

imminent and that she would be paid at closing.[37]  But the reality was that secured construction loans in the amount of $718,600 had been previously recorded against the property, *after* Cristobal's unrecorded mortgage loan was made in August 2004, and the project was facing foreclosure.[38]  Cristobal was not told about the prior loans or the sale of the Palmer Street property.[39]

In December 2008, Cristobal learned that Palmer Street had been sold without her knowledge or consent or any payment to her.  She learned this after speaking to William Paranto, a former police officer for Passaic, who obtained a mortgage against the property fifteen months after Cristobal made her loan.[40]  Cristobal sent Mrs. Kennedy an email on December 2 pleading for her assistance in getting back the investment she made over four years ago.  Mrs. Kennedy responded the following day by indicating that she had little knowledge of what was happening with Palmer Street but the property had been sold, funds were in an attorney trust account, and Cristobal would be paid.[41]

Notwithstanding these assurances, Mrs. Kennedy had executed a settlement agreement on November 25, 2008 -- a week earlier -- pursuant to which the property was sold to Charles Shulman, a principal of New Jersey Lenders Corp., for $802,639.12.[42]  Although the settlement appeared to require the consent and cooperation of "Affected Third Party Interests," which included Cristobal and Paranto,[43] Cristobal's consent to the transaction was never obtained or even requested.  The Colons received $120,000 from these proceeds, while the Debtors received $140,675.04, $40,000 of which they used to pay themselves with the remainder being paid to

---

[37] (Trial Tr. 136:5-12, June 15, 2015); (see also P-35).
[38] (See P-41 and P-43).
[39] (Trial Tr. 144:24-145:12, Nov. 14, 2013).
[40]  (Trial Tr. 136:19-139:22, June 15, 2015; Trial Tr. 6:15-23, Nov. 15, 2013).
[41] (P-35). ("You will get what's owed to you. I just can't promise you how soon that will be").
[42] (See P-36). Schedule A to Gruhin's letter dated Sept. 17, 2008 shows that these "Affected Third Party Interests" had total debt in the amount of $571,000 against Palmer Street, including the $150,000 owed to Cristobal.
[43] (*Id.* at 2).

Gruhin.[44]   The $40,000 was wired to the Debtors' S&S Development account on December 2, 2008, the same day that Mrs. Kennedy promised Cristobal that she would "get what's owed" to her from a sale of the property.[45] Neither the Kennedys nor the Colons (nor Gruhin) had a mortgage on the Palmer Street property.

Cristobal did not receive any portion of the sale proceeds from Palmer Street.[46]  The last payment Cristobal received from the Debtors was a check in the amount of $1,500 from the S&S Development account on November 26, 2008, one day after the settlement had closed, but before the settlement proceeds were disbursed to the Kennedys on December 2, 2008.

As to Mrs. Kennedy, Cristobal acknowledged that she was not involved in the initial loan transaction.[47]   While this lack of involvement is relevant to whether Mrs. Kennedy's debt to Cristobal was dischargeable under section 523, that determination is not technically necessary because this Court has determined Mrs. Kennedy is not entitled to a discharge.   Thus, Mrs. Kennedy remains liable to Cristobal for her obligations under the mortgage note, which her husband was authorized to sign on her behalf, irrespective of whether that debt may have been dischargeable under section 523.

## III.     Ruiz Complaint

Dr. Frank Ruiz worked with Mrs. Kennedy at the Clifton Surgical Center, where she was employed as Director of Nursing.  Ruiz learned of the Debtors' real estate business through social visits to the Kennedys' residence.

---

[44] (See P-37, Title Closing Stmt.); (P-39).
[45] (P-39).
[46] Paranto received $90,000 in return for his initial investment of $135,000. (P-37); Trial Tr. 32:17-25, Nov. 15, 2013).
[47] (See, e.g., Trial Tr. 29:4-30:24, Nov. 14, 2013).

## A.  The Third Street Property

In late 2006, Mr. Kennedy proposed that Ruiz invest in the development of a six-unit apartment building located at 243 Third Street in Passaic ("Third Street").[48]  Kennedy told Ruiz that all that was needed to complete the project was a $100,000 construction loan.   Kennedy and Ruiz traveled together to the property site, where they observed the building under construction. Ruiz agreed to loan Kennedy $100,000, payable in one year at twenty-four percent interest, to complete construction, after Kennedy assured him that the loan would be used for that purpose.[49]

On May 2, 2006, Ruiz went to the office of the Kennedys' attorney, Carl Zoecklein, and delivered a $100,000 check payable to Mr. Kennedy.  In exchange, Ruiz received a note and mortgage on the Third Street property in the same amount.[50]  Although Ruiz believed Zoecklein would record his mortgage, it was not recorded until January 2008, after mortgages in the amount of $455,532.67 (all of which were granted after the Ruiz transaction) had been recorded against the property.[51]

Three days after the loan was made, Kennedy deposited the $100,000 check into the bank account for 447 Van Houten, LLC.[52] Although the loan was intended to be used solely for the development of 243 Third Street, the evidence shows that it was used in substantial part for other purposes. William Cunningham, the contractor for both 243 Third Street and 447 Van Houten,

---

[48] 243 Third Street was owned by Mr. Kennedy and Lira (Trial Tr. 48:17-18; 92:6-7; 148:16-18, Nov. 15, 2013).

[49] (Trial Tr. 29:15-30:2; 33:11-18, Nov. 14, 2013).

[50] (P-3 and P-4).  Here, the Court notes that the Kennedys' attorney prepared the mortgage notes and mortgage and Ruiz went to his office to have the document signed and, he believed, recorded.  This is similar to what Cristobal believed the process would be, although her mortgage note was given to her by Mr. Kennedy and never recorded. The Court also notes that Mr. Kennedy testified at trial that his name was "forged" on the mortgage and mortgage note that were delivered to Ruiz at the Kennedys' attorney's office in exchange for Ruiz's $100,000 loan.  This testimony is not credible and irrelevant in any event as the signatures were witnessed by Kennedy's attorney and there is no evidence Mr. Kennedy's signature was not authorized.  (P-1 and P-3); (Trial Tr. 24:15-23; 25:5-16; 26:14-20; 29:15-21; 33:15-21, Nov. 14, 2013).

[51] (See P-8).  This fact pattern is also similar to the Cristobal loan transaction.  (See also ECF No. 53, Pls.' Post-Trial Summation at 62).

[52] (See P-2). The deposit brought the account balance for 447 Van Houten, LLC to positive from a negative balance of $18,386.81, similar to the Cristobal transaction.  Also, according to Mr. Kennedy, the 447 Van Houten account was to be used solely to fund the development of the eighty-three-unit Van Houten Avenue complex.  (Trial Tr. 78:16-22; 79:8-25, June 12, 2015).

14

reviewed checks written using the proceeds of the Ruiz loan and could not identify any that related to the expenses of 243 Third Street, although significant funds were spent on 447 Van Houten.  The Debtor did not have or maintain adequate records to document what happened to the Ruiz loan proceeds.  However, an analysis of the Van Houton account proffered by Debtors' accountant, Justin Pisano, indicated that those loan proceeds were used primarily, if not exclusively, for the 447 Van Houton Street project and most of the proceeds could not be traced to the Third Street property.[53]  Ruiz first learned of issues with 243 Third Street when he was named in a foreclosure complaint by a senior lender.  The property was foreclosed and none of Ruiz's loan was repaid.

### B.  <u>The Howard Street Property</u>

In the fall of 2006, before Ruiz became aware of the issues with the Third Street property, he entered into a "partnership" with Kennedy to subdivide and develop a two-family residence at the corner of Howard Street and Idaho Street in Passaic ("<u>Howard Street</u>").  The understanding was that Ruiz would contribute the funds to purchase the property, while Mr. Kennedy was responsible for arranging the construction financing, the construction itself and payment of the bills.  The profits would be divided equally after Ruiz was repaid his initial contribution.[54]

Howard Street was purchased by Kennedy and Ruiz in December of that year for $325,000.[55]  Ruiz contributed the $32,500 down payment and the balance of the purchase price came from a $292,500 mortgage loan from New Jersey Lenders Corp. secured by the Howard Street property.[56]  After the subdivision was completed in June 2007, Kennedy told Ruiz that the property needed to be owned free and clear of all mortgages in order to obtain a construction

---

[53] (Trial Tr. 116:22-118:21, Mar. 7, 2014 and P-10).  (See also Trial Tr. 35:16-39:8, Apr. 17, 2014).
[54] (Trial Tr. 38:2-10, 40:15, Nov. 14, 2013).
[55] (P-12).
[56] *Id.*, includes deed, $32,500 check and mortgage.

loan.[57]  To pay off the New Jersey Lenders Corp. mortgage, Ruiz took out a $315,000 second

mortgage on his home, also with New Jersey Lenders.[58]  Ruiz and Kennedy then obtained a

construction loan from Sun Home Loans secured by the Third Street property, which provided

for an initial draw of $160,000 for expenses such as demolition of the property, closing costs and

start-up costs[59]  Mr. Kennedy acknowledged that the construction loan proceeds were to be used

only for the project being financed and that the loan documents so provide.[60]

On August 16, 2007, Ruiz and Kennedy received a $120,100 check, representing the

initial draw less closing fees and costs.[61]  Ruiz endorsed the check and gave it to Kennedy, who

deposited it in the S&S Development account.[62]   Ruiz understood that these funds would be

used in connection with the Howard Street property.[63]

During discovery, the only evidence as to how these loan proceeds were used came from

bank records subpoenaed by the Plaintiffs and records prepared by the Debtors' accountant for

the purpose of filing tax returns.[64]  However, on June 15, 2015, in the middle of trial, Mr.

Kennedy produced for the first time a portion of the checkbook register for the S&S

Development account, which he claimed showed how $112,798 of the proceeds from the

$120,100 draw were spent.[65]  This check register, which Kennedy testified that he found at his

home several months earlier in 2015, was missing sixteen months of entries and was the *only*

exhibit produced by the Debtors at trial.[66]  Kennedy later testified that he must have had the

register in his possession when the Plaintiffs issued their subpoena in 2010.[67]

---

[57] (Trial Tr. 43:21-25, Nov. 14, 2013).
[58] (P-14); (Trial Tr. 43:21-44:6, Nov. 14, 2013).
[59] (P-15 and P-16). (Trial Tr. 47:24-48:8, Nov. 14, 2013).
[60] (P-15 and P-16).  (Trial Tr. 49:19-25; 50:25-51:5, Sept. 23, 2015).
[61] (See ECF No. 52, Pls.' Facts ¶¶ 23-33).
[62] (P-17, Statement, Aug. 31, 2007); (Trial Tr. 49:6-51:11, 51:23-53:7, Nov. 14, 2013).
[63] (Trial Tr. 48:23-49:5; 49:16-19; 51:9-11, Nov. 14, 2013).
[64] (See, e.g., S&S Development Balance Sheet, P-49).
[65] (D-1).  However, even this faulty and belated explanation leaves a shortfall of over $7,000.
[66] (Trial Tr. 110:22-111:3, June 15, 2015).
[67] (Trial Tr. 31:7-11, Sept. 23, 2015).

Although the register purportedly shows the use of the $120,100 draw on the construction loan, its entries conflict with the testimony of William Cunningham, the general contractor on the project. While Kennedy claimed that he paid approximately $33,800 to a subcontractor called EROS Construction to demolish the burned-down structure at Howard Street,[68] Cunningham testified that Kennedy paid him no more than $20,000 to clear the property at Howard Street, and that he used those funds from Kennedy to hire and pay EROS Construction.[69]  He also testified that several checks made payable to him by Kennedy were not used on Howard Street and that his signature on them was forged.[70]

Examples of these checks include check No. 1790, which is a check for $3,500 made payable to Cunningham that was cashed at a check cashing store in Passaic.  Cunningham testified that it was not his signature on the back of the check and that he never received this money.[71]  Other checks included on the register produced by Kennedy do not appear to have been paid to the party indicated in the "memo" portion of the check.  For instance, although check No. 1398, payable to cash, includes the notation "M. Evans, Acct (267 Howard),"[72] the check was cashed at "Wayne Karate, Inc., DBA Tiger Schulmann's Karate."[73] Furthermore, an analysis of records from the S&S Development account performed by the Debtors' accountant shows that $26,201.11 of the construction loan could be attributed to payment of the Debtors' personal expenses such as personal income taxes, pool repairs, mortgage payments, and that few of those expenses could be attributed directly to Howard Street.[74]  Instead, the major part of the remaining funds was used for other projects.[75]  The Court finds Mr. Kennedy's testimony on

---

[68] (See Oct. 7, 2011 Dep. of Stewart Kennedy, 42:12-15, P-67).
[69] (Trial Tr. 17:13-24, Apr. 17, 2014).
[70] (Trial Tr. 22:19-23:9, Apr. 17, 2014); (*Id.* 54:1-15).
[71] (See P-67, Check No. 1790); (Trial Tr. 22:19-23:6, Apr. 17, 2014).
[72] M. Evans was the architect for 267 Howard (Trial Tr. 21:23-24, Apr. 17, 2014; Trial Tr. 108:22, June 12, 2015; Trial Tr. 49:4, Sept 24, 2015).
[73] (See P-67, Check No. 1398); (Trial Tr. 48-50, Sept. 24, 2015).
[74] (P-18 and P-66).
[75] *Id.*

these issues is not credible, as contradicted by his own contractor, accountant and, in many respects, the notations and markings on his checks.

Further, Ruiz examined the register and testified that only two monthly payments were made on the construction loan from Sun Home Loans, which he believes caused it to go into foreclosure.[76]  As a result, foreclosure and personal judgments were entered against Ruiz and his wages were garnished.[77]

As to Mrs. Kennedy, the testimony and evidence presented at trial demonstrated that she had no direct or indirect involvement in the loan or "partnership" transactions between Mr. Kennedy and Ruiz, and was not a signatory to the loan or other transactions between Mr. Kennedy and Ruiz.[78]  Thus, in contrast to the evidence presented against Mr. Kennedy, the evidence produced at trial did not support Ruiz's section 523(a) claims against Mrs. Kennedy for fraud, breach of fiduciary duty or willful or malicious injury with respect to Ruiz.

## IV.    Lira Complaint

John Lira is a retired deputy chief for the Police Department for the City of Passaic and was formerly a very close friend of Mr. Kennedy.  Along with Mrs. Kennedy and Suzette Colon, Lira was an equal one-third owner of 447 Van Houten, LLC and a half-owner of Lircostew, LLC with Mr. Kennedy.  With respect to both 447 Van Houten, LLC and Lircostew, LLC, Mr. Kennedy handled the financial aspects of the business and controlled the bank accounts and Lira managed the construction aspects.[79]

The eighty-three-unit condominium development at 447 Van Houten was initially financed by a $5.5 million construction loan from LG Capital Funding, LLC ("LG Capital").  In March 2006, Mr. Kennedy, Lira and Danny Colon decided to use some of these construction

---

[76] (Trial Tr. 38:1-39:7-13, Sept. 24, 2015).
[77] *Id.*
[78] (See, e.g., Trial Tr. 87:11-23; 89:24-90:5; 91:14-22).
[79] (Trial Tr. 106:8-10, Nov. 15, 2013); (Trial Tr. 102:6-11, June 10, 2015); (Trial Tr. 154-155, June 15, 2015); (Trial Tr. 19:8-23, Sept. 23, 2015).

loan funds to invest in the stock market.[80]   Kennedy opened an account in his name with Oppenheimer & Co. for this purpose.   Around the same time, Kennedy and Lira also agreed to use funds loaned to Lircostew to invest in the stock market through this account.[81]   According to Lira, the parties agreed that funds invested into these accounts would eventually be returned to the businesses and used for construction.

Mr. Kennedy made an initial deposit of $68,300 from the 447 Van Houten, LLC bank account into the Oppenheimer account on March 23, 2006.[82]   Including the initial deposit, a total of $231,200 was transferred from 447 Van Houten to the Oppenheimer account between March and December 2006.[83]   On April 7, 2006, $64,000 was withdrawn from the Lircostew bank account and deposited into the Oppenheimer account.   Based on the evidence produced at trial, this was the only deposit from Lircostew into the account.   The Debtors also contributed a total of $55,700 from the S&S Development account into the Oppenheimer account.   Thus, a total of $350,900 was deposited into this account.[84]

Records subpoenaed by Plaintiffs from Oppenheimer & Co. show that Mr. Kennedy withdrew $321,532.18 from the account prior to the petition and withdrew $7,552.63 *after* the case was filed.   Of these withdrawals, $54,061.71 was deposited into the Debtors' S&S Development account by way of checks made payable to Mr. Kennedy.[85]   The remaining $267,470.47 of withdrawals is unaccounted for.   According to Mr. Kennedy, there were no funds in the Oppenheimer account on the petition date.

At trial, Mr. Kennedy explained this depletion by stating he only withdrew personal funds invested in the account through S&S Development.   He asserted that the securities purchased with the $55,700 investment from S&S Development increased in value (enabling him

---

[80] (Trial Tr. 94:3-96:3, Apr. 17, 2014).
[81] (P-52).
[82] (See P-83, Oppenheimer Consolidated Transaction Report).
[83] (*Id.*)
[84] (See P-52, P-64, P-65, P-83-1, P-83-3, P-83-4).
[85] (See P-65, P-83, P-83-4).

to withdraw funds for his own purposes), while stocks purchased with funds invested from 447 Van Houten, LLC and Lircostew, LLC "went to zero balances" and were total losses.[86] Ultimately, none of the $295,200 transferred from 447 Van Houten, LLC and Lircostew, LLC was returned to either entity. During the trial, there was no evidence presented that showed which stocks were purchased with the funds invested by each entity or which stocks were profitable and which were not. As a result, the Court also finds the record-keeping as to the Oppenheimer account to be woefully inadequate and unsatisfactory and that Mr. Kennedy's testimony as to the allocation of funds and profits and losses from trades in the Oppenheimer account to be not credible or supported by any evidence, other than Mr. Kennedy's self-serving statements.

447 Van Houten, LLC ran out of funding in 2007 and LG Capital threatened to foreclose the property. The Debtors, Lira, and the Colons negotiated a settlement in which the property was transferred to Mrs. Kennedy and deeded to LG Capital in lieu of foreclosure. In exchange, the parties were released from personal guarantees of the mortgage loans in the amount of approximately $9.5 million.[87] As part of the settlement, Lira and the Debtors, along with Suzette and Danny Colon, executed an "Irrevocable General Release" dated October 29, 2007 among themselves.[88] The release states, in relevant part:

> Releasors [defined to include Lira] knowingly, voluntarily and without duress, do hereby in perpetuity, jointly, severally, and irrevocably release, acquit, and forever discharge Releasees [defined to include Mr. and Mrs. Kennedy] . . . from any and all claims, rights, actions, causes of action, suits, [etc.] . . . from the beginning of time to the date of this Release . . . .

Lira executed the release in an individual capacity and in his capacity as a member of 447 Van Houten, LLC.

---

[86] (Trial Tr. 54:9-19, June 12, 2015); (*Id.* at 81:11-17); (*Id.* at 94-95).
[87] (Pls.' Br. in Opp'n to Debtors' Mot. for Summ. J., Ex. 3, Adv. No. 10-02634, ECF No. 50-3).
[88] (Debtors' Mot. for Summ. J., ECF No. 45-3).

At trial, Lira claimed he was fraudulently induced to enter into the release as to Mr. and Mrs. Kennedy (but not the Bank) because he was never told that the Kennedys were going to receive any of the proceeds of the settlement and that contrary to what he was told by Mr. Kennedy or his attorney, Lira's release in favor of the Kennedys was not required by the Bank as part of the settlement.

## V.    Section 727 Claims

Cristobal and Lira's claims under section 727 are based on the same allegations that the Debtors concealed assets by failing to disclose them in their bankruptcy petition, transferred estate assets after the petition, failed to keep adequate records from which their financial history can be assessed, and made false statements in connection with the case.   Many of the facts supporting these claims are included in the discussion section of this Opinion.

## VI.    Trial

Trial in these adversary proceedings was conducted over nine days, commencing on November 14, 2013 and concluding on September 24, 2015.[89]   At the end of the fourth day of trial on April 17, 2014, the Debtors made an oral motion to dismiss all three complaints.[90]   As to Mrs. Kennedy, the Court dismissed the Plaintiffs claims under sections 523(a)(4) and 523(a)(6) and 727(a)(2)(A) and (B), finding that Plaintiffs' failed to set forth a prima facie case that Mrs. Kennedy acted with fraudulent intent under those sections, but allowed the remaining counts against Mrs. Kennedy to proceed.   The Court denied the motion in its entirety as to Mr. Kennedy.[91]

---

[89] The seven other trial dates were November 15, 2013, March 7, 2014, April 17, 2014, June 10, 12, and 15, 2015, and September 23 and 24, 2015.  The trial initially proceeded before Judge Steckroth, who retired in February 2015. This case was then assigned to Judge Papalia.

[90] (See Trial Tr. 154-167, Apr. 17, 2014).

[91] (Order Den. Defs.' Mot. for Summ. J., at 2, Adv. No. 10-02634, ECF No. 60-1, Apr. 30, 2014).

## DISCUSSION

### I.    Section 727 Claims

Section 727 of the Bankruptcy Code grants the "honest but unfortunate" debtor a discharge of his or her pre-petition obligations in exchange for complete and truthful disclosure of one's assets, liabilities, and financial history to creditors.  The bankruptcy discharge has been described as the "heart" of the bankruptcy code's fresh-start provisions.[92]    As a result, courts will generally only deny a discharge in exceptional circumstances and will construe the exceptions to discharge strictly against the creditor and liberally in favor of the debtor.[93]

 While exceptions to discharge are narrowly construed, "good faith and candor" are necessary prerequisites for a discharge.[94]  If a creditor establishes prima facie grounds for denying discharge under section 727(a), the burden shifts to the debtor to show that discharge is warranted.  But the ultimate burden remains on the creditor to show by a preponderance of the evidence that an exception to discharge applies.[95]

Cristobal and Lira's claims under sections 727(a)(2), (a)(3), (a)(4) and (a)(7) will be addressed together because they involve the same facts and allegations.  Because Cristobal and Lira set forth a prima facie case for denial of Mr. Kennedy's discharge under these sections and he failed to rebut their claims, judgment will be entered against Mr. Kennedy on these counts. Whether Mrs. Kennedy's asserted lack of involvement in Mr. Kennedy's business dealings provides a legitimate defense to all these claims is a somewhat closer question that will be addressed in more detail in Part D of this section, *infra* pages 48-52.  Ultimately, however, this Court finds that Plaintiffs satisfied their burden to prove their claims against both Mr. and Mrs.

---

[92] *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993).
[93] *In re Cohn*, 54 F.3d 1108, 1113 (3d Cir. 1995).
[94] *In re Matus*, 303 B.R. 660, 670 (Bankr. N.D. Ga. 2004).
[95] *In re Butler*, 377 B.R. 895, 915 (Bankr. D. Utah 2006).

Kennedy under sections 727(a)(3), 727(a)(4) and 727(a)(7).   Accordingly, judgment will be entered denying Mr. and Mrs. Kennedy's discharge under each of those sections.

### A.    11 U.S.C. § 727(a)(2)

A debtor will be denied a discharge under section 727(a)(2) if he or she:

> with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
> (A) property of the debtor, within one year before the date of the filing of the petition; or
>
> (B) property of the estate, after the date of the filing of the petition;

11 U.S.C. § 727(a)(2).   To establish a claim under this section, a plaintiff must show: (1) the debtor transferred, removed, or concealed property; (2) the property belonged to the debtor or was property of the estate; (3) the act occurred within one year of the filing of the petition or after the filing of the petition; and (4) the act was done with intent to hinder, delay, or defraud a creditor.[96]   Concealment exists where a debtor hides or withholds knowledge of property of the estate.[97]   Intent to conceal may be established through circumstantial evidence or inferences drawn from a general course of conduct.[98]   While a single instance of a wrongful transfer or act of concealment may be sufficient to warrant denial of discharge, a pattern of suspicious or wrongful acts is stronger evidence of intent to defraud.[99]

---

[96] *In re von Kiel*, 550 Fed. Appx. 105, 108 (3d Cir. 2013).
[97] *United States v. Schireson*, 116 F.2d 881, 884 (3d Cir. 1940).
[98] *See Spyra v. Finney (In re Finney)*, 333 B.R. 242, 247 (Bankr. W.D. Pa. 2005).
[99] *In re Matus*, 303 B.R. at 672.

The Plaintiffs' claims under section 727(a)(2) focus on three acts of concealment or nondisclosure by the Debtors[100] on or after the petition date: (1) the Oppenheimer Brokerage Account; (2) 40 Sleepy Hollow Drive property; and (3) DCL, LLC.

### 1. Oppenheimer & Co. Brokerage Account

The Debtors did not mention the Oppenheimer & Co. account that was opened in Mr. Kennedy's name to invest over $300,000 in March 2006 anywhere in their initial filings with the Bankruptcy Court, including their petition and schedules.  But one month before the case was filed, two separate withdrawals of approximately $5,000 were made from that account.[101]

The Debtors did not initially schedule the Oppenheimer account even though Schedule B (Item 3) expressly calls for the disclosure of any "[c]hecking, savings or other financial accounts . . . or shares in banks . . . or credit unions, brokerage houses."[102]  Nor did the Debtors list the Oppenheimer account in response to questions pertaining to closed financial accounts on the statement of financial affairs (Item 11).  The Debtors did not produce the account records in response to the Plaintiffs' subpoena requesting production of all "investment account statements" and "brokerage account records" since January 2006.[103]  The Plaintiffs were forced to obtain these records by issuing a subpoena to Oppenheimer.

After the Plaintiffs brought the Oppenheimer account to the attention of the Court, the Debtors amended their Statement of Financial Affairs, scheduling it as a "closed financial account" on January 17, 2011.[104]  However, three months *after* making this amendment, Mr.

---

[100] The reference in this section is to Debtors, because they jointly filed their petition and related documents. However, because the section 727(a)(2) claims were dismissed by Judge Steckroth as to Mrs. Kennedy, the analysis and effect of the claims under this section relate only to Mr. Kennedy (Trial Tr. 174:2-6, Apr. 17, 2014).

[101] On April 8, 2010, the Debtors withdrew $5,000 from the account and on April 16, 2010, the Debtors withdrew $5,014.98 from the account. (P-83); (Trial Tr. 116:6-117:5, June 12, 2015).

[102] The Debtors also failed to schedule a joint account in both of their names with Smith Barney.  Although this account was inactive since 2007, it was required to be disclosed on the petition since it was still an open account.

[103]  (P-87, Schedule A at ¶¶ 1, 16; P-88).

[104] This was in response to question 11 of the Statement of Financial Affairs, which called for the Debtors to list "all financial accounts . . . in the name of the debtor . . . which were closed, sold, or otherwise transferred within one year immediately preceding the commencement of this case" including "share accounts held in . . . brokerage houses and other financial institutions." (Q. 11, ECF No. 69).

Kennedy began withdrawing thousands of dollars from the account. Records subpoenaed from Oppenheimer reveal that Mr. Kennedy made the following withdrawals from this allegedly closed account *after* the Debtors filed their petition on May 12, 2010 and after the amendment was filed on January 17, 2011:

- $4,771.27 on April 21, 2011;

- $2,300 on July 14, 2011;

- $481.36 on July 29, 2011.[105]

The Debtor's argument that this was a "closed" financial account is refuted by the post-filing checks noted above. Further, the alleged lack of any balance in the account does not justify the failure to disclose it. The Court also notes that the alleged lack of a balance does not necessarily mean the account was closed. The same exhibit, P-83, shows that checks totaling over $16,000 were written from that same account in late March and April 2010, just prior to the filing. No explanation was provided at trial as to how this allegedly closed account could have had checks written against it after (and just prior to) the Kennedys' bankruptcy filing.

Despite amending their schedules seven times, the Debtors never included the Oppenheimer account as an active account. Compounding the false oaths, in the Debtors' joint certification in opposition to the Plaintiffs' motion for summary judgment, the Kennedys certified that the Oppenheimer and Smith Barney accounts were "put on as an amendment and because there was no balance in those accounts at the time of the bankruptcy filing, there was no import for their being initially being left off."[106]

In sum, even with the multiple amendments, this Court finds that Mr. Kennedy concealed the Oppenheimer account and made false statements under oath in connection with that account, that the concealments and false statements were knowingly and fraudulently made by Mr.

---

[105] (See P-83, Oppenheimer Consolidated Transaction Reports, and related checks).
[106] Debtors' Cert. in Opp'n to Summ. J., at 5, ¶ 5, Adv. No. 10-02634, ECF No. 53, filed Jan. 16, 2012.

Kennedy with respect to a material matter -- a brokerage account -- that references a potentially significant asset, as evidenced by over $7,500 in withdrawals from that account *after* the filing and another $16,000 just before it.   These materially false statements and omissions helped defeat the Plaintiffs' summary judgment motions, as set forth in Judge Steckroth's Opinion denying both sides' motion for summary judgment dated May 7, 2013.[107]  In short, there is no doubt as to the falsity and materiality of Mr. Kennedy's sworn statements with respect to the Oppenheimer account, and that the false statements were made with the intent to hinder, delay and/or defraud creditors.   Thus, the omissions and false statements regarding the Oppenheimer account are, by themselves, sufficient and independent grounds to deny Mr. Kennedy's discharge.   However, as explained below, the Kennedys' lack of candor as to the 40 Sleepy Hollow Drive property provides an even stronger case for denial of the discharge.

### 2.   40 Sleepy Hollow Drive

On June 14, 2010, approximately one month *after* the petition date, Mr. Kennedy deeded his one-half interest in residential property located at 40 Sleepy Hollow Drive, Wayne, New Jersey ("40 Sleepy Hollow") to Anne Federico, Mrs. Kennedy's mother and the other half-owner of the property, for one dollar.[108]   A rebuttable presumption of fraud arises where a debtor transfers property without consideration.[109] The Debtors did not initially schedule Mr. Kennedy's interest in this property or his liability on the property's $417,000 mortgage.  The Debtors also failed to mention the property or the deed to Federico at the section 341(a) meeting of creditors, which was conducted only eleven days after the transfer.

After the Plaintiffs questioned Mr. Kennedy about 40 Sleepy Hollow during his Rule 2004 examination, the Debtors filed an amended Schedule A listing a joint interest in fifty

---

[107] (ECF No. 60 at 10).
[108] (P-55).
[109] *In re Grimlie*, 439 B.R. 710, 716 (B.A.P. 8th Cir. 2010).

percent of the property, valued at $421,000 subject to a secured claim of "0.00."[110]  In the column that calls for a description of the property, the Debtors state: "Refinanced by Anne Federico, mother-in-law, after filing of petition. Previous mortgages paid by refinance after debtors removed from deed. Market analysis $349,000.00."[111]  The Debtors also amended Schedule C to somehow claim a $43,250 exemption in 40 Sleepy Hollow.[112]  Three months later, Debtors filed a second amended Schedule A, valuing their interest in the property at $349,000 subject to a $422,000 secured claim.[113]

Further, notwithstanding the sworn assertion that this property was transferred so that Federico could refinance it, a November 2013 title search -- done more than three years after the Debtors' filing -- shows that the only outstanding mortgage against the Property was a $417,000 mortgage from Mr. Kennedy and Federico to MERS, dated June 14, 2007.[114]  Thus, there was no refinance of that mortgage, and the Debtors did not provide any evidence showing that any refinancing occurred.  Further, the Kennedys' certified statement that Mr. Kennedy did not "put down any of his own money as a down payment" was at least misleading.  The accounting and supporting records obtained by Plaintiffs showed that checks or other financing from S&S Development totaling $60,650 were related to the 40 Sleepy Hollow property.[115]

Thus, this Court finds the Debtors knowingly and fraudulently concealed this property and made false statements in their schedules, as repeatedly amended, and in their certification with respect to the following additional material matters: (1) Mr. Kennedy's ownership interest on 40 Sleepy Hollow, which was not initially disclosed; (2)  Mr. Kennedy's post-petition transfer of this property; (3) the refinancing of the mortgage on that property, which did not occur; and

---

[110] (Am. Schedules, ECF No. 69).
[111] (*Id.* at 1). The Debtors appear to have misspelled Federico's last name as Tederico.
[112] (*Id.* at 5).  It is not clear why or how the Debtors attempted to claim an exemption in a property that was not their residence and that they claimed they did not consider themselves to own.
[113] (Am. Schedules, ECF No. 107).
[114] (P-55).
[115] (P-49 at 2).

(4) the reason for the undisclosed post-petition transfer, i.e., to effect the refinancing, was also false.  The knowing, fraudulent and false nature of these actions and statements is highlighted by the fact that the 40 Sleepy Hollow property is owned by Mrs. Kennedy's mother, who lived there with her own mother (and Mrs. Kennedy's grandmother) and that it is located on the very same street as the Debtors' home.  The Court further finds that these transfers, actual and alleged, and false statements, which were never fully or accurately explained, were made with the intent to hinder, delay and/or defraud their creditors.

### 3. DCL, LLC

DCL, LLC was formed to develop twelve townhouses on Lafayette Street in Passaic.  Mrs. Kennedy owned a twenty-five percent interest in DCL, along with Mark Casamassina, Michael Simone, and Joseph Simone.  Lira testified that DCL was an active business on the petition date and that two townhouses were sold after the petition date.[116]  Mrs. Kennedy's interest was not scheduled on the petition, but was added by virtue of the Debtors' January 17, 2011 amendment, which stated: "All Business Defunct, No Value to Debtor."  At trial, Mr. Kennedy initially testified that DCL was inactive on the petition date, but on cross-examination stated that he was not sure whether it was active.  He explained that although Mrs. Kennedy may have signed documents at closing of the sale of townhouse units, they did not receive any proceeds from the sale and that he was not sure whether the sale occurred pre- or post-petition.[117]

The Plaintiffs' proofs with respect to whether townhouse units from DCL were sold post-petition is equivocal, as they rely principally on Lira's testimony and Mr. Kennedy's inability to deny Lira's assertions with certainty.  No documentary evidence was provided by either party in this regard.  Taken alone, this claim may not have been sufficient to deny the Debtors' discharge.  However, the failure to list this business, the lack of clarity as to whether it

---

[116] (Trial Tr. 94:8-96:2, Nov. 15, 2013).
[117] (Trial Tr. 173:14-175:4, June. 12, 2015).

continued to operate all the way through trial and in the face of multiple amendments to the Debtors' schedules, demonstrates the lack of care the Debtors consistently displayed in preparing their bankruptcy schedules and multiple amendments, and the lack of adequate record-keeping by Debtors. These failures made Plaintiffs' case extremely burdensome to prove and required them to go to third parties to obtain what should have been available to and produced by the Debtors (e.g., bank statements, brokerage statements, receipts, checks, check registers, etc.).

### 4.    The Debtors' Justifications

All of the elements of a prima facie claim under section 727(a)(2) are established by the omission of the Oppenheimer account because: (1) Mr. Kennedy concealed the account by failing to list it in the initial schedules, by failing to produce account records in response to the Plaintiffs' subpoena, and by inaccurately describing it as a "closed account" in amended schedules; (2) Mr. Kennedy's interest in the account and any stocks or other assets held in the account constitutes property of the estate under section 541;[118] (3) the concealment took place on and after the petition date; and (4) fraudulent intent may be inferred, especially since the nondisclosure inured to the benefit of the Debtors and to the detriment of their creditors as evidenced by (among other things) the post-petition transfers to Mr. Kennedy.

A prima facie claim under this section was also established by the omission of 40 Sleepy Hollow because: (1) the Debtors concealed the property by failing to list it on their initial schedules and failing to mention the post-petition transfer of Mr. Kennedy's interest in the property in their initial schedules until and at their 341(a) meeting; (2) Mr. Kennedy's interest in 40 Sleepy Hollow is property of the estate;[119] (3) the concealment took place on and/or after the

---

[118] *See In re LandAmerica Fin. Grp., Inc.*, 412 B.R. 800, 809 (Bankr. E.D. Va. 2009) ("[M]oney held in a bank account in the name of a debtor is presumed to be property of the bankruptcy estate").

[119] 11 U.S.C. § 541(a)(1) (the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case").

petition date; and (4) there is a presumption of fraudulent intent because no consideration was received for the post-petition transfer.

Having established a prima facie case under section 727(a)(2), the burden shifts to the Debtors to offer a satisfactory explanation for their outwardly wrongful conduct. In a certification filed with the Court on January 12, 2012, the Debtors offered the following explanation for their omission of the Oppenheimer account: "[a]s to Oppenheimer and Smith Barney they were put on as an amendment and because there was no balance in those accounts at the time of the bankruptcy filing, there was no import for their initially being left off."[120]   At trial, Mr. Kennedy testified that he did not disclose the account because it "was at a zero balance" on the petition date.[121]   Yet, there is uncontroverted evidence that there were post-petition transfers from this account.  Further, the Debtors offered no reasonable explanation for why the account was listed as "closed" in the amended schedules and Statement of Financial Affairs.

The Debtors' alleged justifications do not negate the inference and evidence of fraudulent intent.  Mr. Kennedy was clearly aware of the account's existence since he withdrew more than $16,000 from the account during the six weeks before filing the petition.  Even if it had a zero balance on the petition date, this would not excuse its omission since question 11 of the Statement of Financial Affairs also calls for financial accounts closed in the past six years to be disclosed.  The Debtors also never offered an explanation for why, upon realizing the account had a positive balance in April 2011, and making withdrawals from that account, they failed to amend their schedules to include the account as an active account.  This omission is made even more glaring by their amendment just three months earlier to list the account as closed.  Even if the Debtors believed they had no obligation to disclose the account when the case was filed,

---

[120] (Debtors' Cert. in Opp'n to Summ. J., at 5, ¶ 5, Adv. No. 10-02634, ECF No. 53, filed Jan. 16, 2012).
[121] (Trial Tr. 26:6-11, June 12, 2015).

there can be no reasonable justification for withdrawing funds after scheduling it as a "closed account." Nor is there any justification for either Mr. (or Mrs.) Kennedy's failure to correctly list the account on the schedules and Statement of Financial Affairs they repeatedly amended, incorrectly and incompletely, as revealed by the docket in this case.

With respect to the omission of 40 Sleepy Hollow, the Debtors explained that Mr. Kennedy did not consider himself to own the property because he merely helped Federico ("Federico") -- Mrs. Kennedy's mother -- obtain financing for its acquisition.[122] But records subpoenaed by the Plaintiffs from Valley National Bank indicate that the Debtors' involvement with the property included much more than just helping to finance its acquisition through the mortgage that included Mrs. Kennedy as an obligor. First, approximately $60,650 in checks were written from the Debtors' S&S Development account with "40 Sleepy Hollow" in the "memo" line.[123] These records also show, among other things, that a $300 check from the S&S Development account was written to Federico with the notation "40 SH" less than two months before the petition. While the Debtors explained these expenditures by stating that they were made as repayment of previous loans made by Federico, they did not schedule Federico as a creditor in the petition and this "explanation" does not address the specific reference to 40 Sleepy Hollow.

Additionally, Mr. Kennedy's explanation that he did not consider himself an owner of the property because he was on the deed solely for financing purposes makes little sense in light of the other facts of this case. First, it is directly contradictory to the Debtors' explanation as to why Mrs. Kennedy's name only was on many of the properties and entities they developed; i.e.,

---

[122] (Debtors' Cert. in Opp'n to Summ. J., at 4, ¶ 3, Adv. No. 10-02634, ECF No. 53) ("Stewart Kennedy never disclosed a 50% interest in 40 Sleepy Hollow because he never considered himself to have an interest in 40 Sleepy Hollow"); (see also Trial Tr. 172:21-173:1, June 12, 2015).
[123] (See P-49 at 2).

Mr. Kennedy's prior bankruptcy and poor credit rating.[124]   Next, Mr. and Mrs. Kennedy scheduled six properties that they owned jointly or in one of their names in connection with their real estate business.[125]  If the Kennedys believed that being on the deed "for financing purposes" meant the interest did not have to be disclosed, none of these interests would have been scheduled.  Further, Mrs. Kennedy admitted that she knew her husband owned a half interest in the property at trial:

> Q:   Now there's a reference here to 40 Sleepy Hollow.  What is that?
>
> A:   That's my mother's home.
>
> Q:   Right.  And your husband owns a half interest in it, correct?
>
> A:   Yes.
>
> Q:   You knew that when you went into the bankruptcy, when you signed the petition, correct?
>
> A:   I did.  I just didn't realize that was on there.  I didn't look over the whole thing.[126]

The Court finds that this omission was not due to mere carelessness, given that Federico is Mrs. Kennedy's mother, and that the Debtors lived just a few doors down from Federico on the petition date, at 56 Sleepy Hollow Road.  Further, the financial information prepared by the Debtors' own accountant shows that $60,650 was disbursed from the Kennedys' S&S Development account in connection with the 40 Sleepy Hollow property.[127]

Additionally, despite the repeated amendments made by the Debtors, they failed to at least initially disclose and/or falsely stated that: (i) Stewart Kennedy transferred his fifty-percent interest in this property to Federico on June 14, 2010, shortly *after* they filed their petition on

---

[124] (See, e.g., Defs.' Summation at 2).
[125] The properties on Schedule D (other than their residence at 56 Sleepy Hollow Drive in Wayne and their beach house at 244 East Long Branch Avenue in Ocean Gate) were: 305 Highland Avenue, 171 Burgess Place, 243 Third Street, 17 Pine Street, 169 Burgess Place, and 274 Howard Street (all in Passaic).
[126] (Trial Tr. 69:25-70:9, June 10, 2015).
[127] (P-49 at 2).

May 12, 2010; (ii) Stewart Kennedy's liability on the $417,000 mortgage on 40 Sleepy Hollow; (iii) Federico's joint liability on the mortgage (as required by Schedule H); (iv) Mr. Kennedy was also an owner of the property; and (v) the debtors were removed from the 40 Sleepy Hollow deed so that Federico could refinance the mortgage on the property and that the mortgage was in fact refinanced.   The documentary evidence admitted at trial shows that the 40 Sleepy Hollow property was not refinanced by Federico after the transfer from Mr. Kennedy and confirms that Mr. Kennedy transferred his interest to Federico after he and his wife filed for bankruptcy, without approval of the transfer.[128]   In fact, the disturbing pattern in this case was that the Debtors' schedules and statements were willfully incorrect and/or incomplete and that Debtors would amend their schedules (repeatedly) only after the inaccuracies or omissions were pointed out to them by the Plaintiffs.[129]   Further, as is noted in more detail below, despite numerous amendments, the Debtors never correctly identified Mr. Kennedy's interest in this property.

Given that: (i) Federico is Mrs. Kennedy's mother; (ii) both Federico and her mother, Mrs. Kennedy's grandmother, lived at 40 Sleepy Hollow; (iii) the Debtors amended their schedules no less than seven times with several of those amendments relating directly to the 40 Sleepy Hollow property; and (iv) more than $60,000 was disbursed from the Kennedys' S&S Development account with respect to 40 Sleepy Hollow, this Court cannot accept and does not believe that these omissions and misstatements were mere negligence or inadvertent. Instead, this Court finds that these misstatements were fraudulently made with knowledge of their falsity and/or a reckless disregard for the truth.  The substantial benefits afforded by the Bankruptcy Code, including particularly the discharge, are provided only to honest but unfortunate debtors,

---

[128] (See  P-55, Title Report as of November 11, 2013) (which shows one outstanding mortgage against the 40 Sleepy Hollow property for $417,000 made by Stewart Kennedy and Anne Federico as "Borrowers" to New Jersey Lenders Corp., no subsequent refinance and no ownership by Mrs. Kennedy).

[129] (See P-48, which includes all seven amendments to the Debtors' schedules and Statement of Financial Affairs).

not reckless or dishonest ones, who callously disregard their obligation of full and accurate disclosure.

Finally, although the Kennedys argued that this omission should be excused because the property was subsequently disclosed and abandoned by the chapter 7 trustee and, therefore, resulted in no benefit to the estate, the fact that an asset does not result in value to the estate does not mean that its omission was immaterial or that it is not grounds for denying the discharge.[130] Here, the pattern of omissions and inaccuracies, despite numerous amendments, is precisely the type of conduct that results in the denial of the discharge even though the estate ultimately received no benefit for the undisclosed or inaccurately disclosed assets.[131] Additionally, given the post-petition withdrawal from the Oppenheimer account, it is less than clear whether there would have been a benefit to the estate from accurate disclosure.

Similarly, the Debtors attempted to explain the omission of DCL, LLC by indicating in a certification that "all the business names were defunct and closed enterprises, therefore, there was nothing to be gained by not listing them."[132] But even if disclosing DCL would not have resulted in any benefit to the estate, creditors and the Trustee were entitled to know of its existence and to investigate the value of Mr. and/or Mrs. Kennedy's interest for themselves. The Debtors also attempted to justify the omission by explaining that they disclosed DCL in an amendment. Here, the Court once again notes that while the inference of fraudulent intent that can arise when an asset is omitted from the petition may be, in certain circumstances, weakened where the debtors amend their schedules to correct the mistake, an amended schedule will not excuse an omission where a satisfactory explanation is not given for failing to disclose the asset in the first place.[133]

---

[130] *See, e.g., In re Matus*, 303 B.R. at 672.
[131] See FN 129 *infra.*
[132] (Debtors' Cert. in Opp'n to Summ. J., at 7, ¶ 21, Adv. No. 10-02634, ECF No. 53).
[133] *In re Ingle*, 70 B.R. 979, 984 (Bankr. E.D.N.C. 1987); *In re Ailetcher*, 49 B.R. 681, 686 (Bankr. D. Haw. 1985).

Thus, judgment will be entered against Mr. Kennedy under section 727(a)(2)(B) denying his discharge.[134]  Since Federico is Mr. Kennedy's mother-in-law and therefore an "insider" as defined in 11 U.S.C. § 101(31)(A)(i), section 727(a)(7) is also applicable to deny Mr. Kennedy a discharge.

### B.    11 U.S.C. § 727(a)(3)

Section 727(a)(3) provides that discharge will be denied if:

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3).  This section requires debtors to maintain and preserve sufficient and accurate record-keeping so that creditors and the trustee may ascertain their financial history and business dealings.[135]  To prove a claim under section 727(a)(3), a plaintiff must show: (1) the debtor failed to preserve adequate financial records; and (2) such failure makes it impossible to ascertain the debtor's financial condition.[136]  Fraudulent intent is not an element of this claim under this section.[137]

### 1.    Failure to Preserve Records

The Debtors (primarily through Mr. Kennedy) operated a substantial real estate business. Mr. Kennedy estimated that, including joint ventures and partnerships, he participated in the redevelopment of forty different properties.  Approximately fifteen different projects were administered through the S&S Development account, which received $2,286,950 in deposits in

---

[134] No judgment against Mrs. Kennedy denying her discharge under this section is being granted because Judge Steckroth dismissed Plaintiff's section 727(a)(2) claims against Mrs. Kennedy at the close of Plaintiff's case.
[135] *Meridian Bank v. Allen*, 958 F.2d 1226, 1230 (3d Cir. 1992); *In re Martin*, 141 B.R. 986, 995 (Bankr. N.D. Ill. 1992); *Holber v. Jacobs (In re Jacobs)*, 381 B.R. 147, 166 (Bankr. E.D. Pa. 2008).
[136] *In re French*, 499 F.3d 345, 354 (4th Cir. 2007).
[137] *In re Juzwiak*, 89 F.3d 424, 430 (7th Cir. 1996).

the four years leading up to the petition date.[138]    Approximately $8 million was deposited into

the checking account of 447 Van Houten LLC, which was under the exclusive control of Mr.

Kennedy.[139] Mr. Kennedy also had signing authority over and maintained the Lircostew account.

In fact, Mr. Kennedy acknowledged he had the check registers for the S&S Development, 447

Van Houten and Lircostew accounts at the time these records were subpoenaed and did not

produce them.[140]

Despite the scope of operations under his control, the only records maintained by Mr.

Kennedy for any of these businesses were the check registers and copies of checks maintained in

the trunk of his vehicles.[141] Although Kennedy would typically make notations in the "memo"

portions of the checks, many checks lacked such memos, and Kennedy was often unable to recall

how such checks were used when asked by his accountant.[142]    Further, Kennedy commingled

funds between different projects and both Kennedys commingled personal and business expenses

(and, apparently, income) in the S&S Development account.[143]

Few records were turned over to the chapter 7 trustee upon the filing of the petition.

Almost eight months after the petition date, the trustee moved to dismiss the case due to the

Debtors' failure to provide valuations and other information regarding certain properties.[144]    On

December 2, 2010, the Plaintiffs issued a Rule 2004 subpoena to the Debtors seeking, among

other things, checkbooks, checking account statements, bank account and brokerage statements,

and financial and corporate records of the Debtors and businesses in which they held interests

---

[138] (Trial Tr. 48:4-7, Sept. 23, 2015).

[139] (Trial Tr. 48:17-49:1, Sept. 23, 2015).

[140] (Trial Tr. 9:3-24; 30:2-31:14, Sept. 23, 2015).

[141] (Trial Tr. 63:12-64:1, June 12, 2015); (Trial Tr. 49:3-4, 93:21-94:9, Sept. 23, 2015); (Trial Tr. 73:22-24, June 12, 2015).

[142] (Trial Tr. 109, June 12, 2015).

[143] (Trial Tr. 102, June 12, 2015).

[144] (Trustee's Mot. to Dismiss for Lack of Cooperation, Jan. 6, 2011, ECF No. 66). The motion was withdrawn and the trustee ultimately abandoned the Debtors' interests in the properties. (See ECF Nos. 81, 83, 84, 85, 86, 89, 103, 104, 105, 106, 110, 112, 118, 120).

dating back to 2006.[145]  The Debtors produced few, if any, documents in response to these requests (other than foreclosure complaints), and indicated that the checkbooks and checks had been given to their accountant, Justin Pisano, so that he could prepare the Debtors' missing tax returns for 2004 to 2010, as an "excuse" for their nonproduction.[146]  But that is not an excuse, since they could have obtained the documents from their own accountant and eventually did so. The Debtors also did not turn over any of the Oppenheimer account records that would have shown how the 447 Van Houten and Lircostew funds were used, so the Plaintiffs were required to subpoena them from Oppenheimer.  The same is true for the Debtors' S&S Development account and prior account at Valley National Bank.

The Debtors' failure to produce these documents required the Plaintiffs to go to great lengths to reconstruct the Debtors' affairs.  The Plaintiffs were forced to subpoena copies of checks and statements from the various entities and attempt to determine how their investments were used by analyzing the notations on each check.  This task was made even more difficult by the commingling of funds between different entities and projects and between personal and business expenses.  The Debtors' lack of coherent recording-keeping, their comingling of funds between projects and between personal and business expenses and their failure to voluntarily provide almost any information or documentation made it impossible for creditors to determine exactly how their funds and assets were used.  Thus, the Plaintiffs have easily established a prima facie claim under this section.

Since the failure to preserve appropriate records has been demonstrated, the burden shifts to the Debtor to provide an adequate justification.[147]  The Debtors argue that this manner of record-keeping is consistent with the practices of small construction companies.  They note that Pisano and Cunningham testified that such companies frequently use only one account for many

---

[145] (See P-87, Schedule A at ¶¶ 1, 6, 13).
[146] (See P-89).
[147] *Meridian Bank*, 958 F.2d at 1233.

projects.  But here, Mr. Kennedy testified that he maintained and controlled separate accounts for S&S Development, 447 Van Houten and Lircostew.  Further, he did not produce those records relating to those accounts even after they were returned to him by his accountant (except for the belated production at trial of incomplete S&S Development registers).

Thus, even if it is true that some small construction companies use only one account, the Debtors' record-keeping falls well short of what is required by section 727(a)(3).  Debtors may not avoid producing information regarding their financial history "under cover of a chaotic or incomplete set of books or records."[148]  Creditors have the right to receive sufficient information so that they can trace a debtor's financial transactions and should not be forced to "speculate as to the financial history or condition of the debtor, nor should they be compelled to reconstruct the debtor's affairs."[149]  Because this is exactly what the Plaintiffs were forced to do, Mr. Kennedy is not entitled to a discharge under section 727(a)(3).  Because she was his partner and also had an independent duty to obtain and provide those records, Mrs. Kennedy is also not entitled to a discharge under this section, as is explained in more detail below.

### 2.    Post-Petition Destruction of Records

While Mr. Kennedy's failure to maintain appropriate records without justification is sufficient grounds for denial of discharge under section 727(a)(3), his admitted post-petition destruction of records, combined with his last minute ability to "find" some of those destroyed records, provides additional and separately sufficient grounds for denial of discharge.  Instead of turning over documents in response to the Plaintiffs' December 2010 subpoena, the Debtors indicated that many of them had been given to their accountant, Justin Pisano.  At trial, Mr. Kennedy testified that he destroyed these records upon receiving them back from Pisano at some point in 2013:

---

[148] *Id*. at 1230.
[149] *In re Juzwiak*, 89 F.3d at 428.

Q: The only records that you maintained on these real estate ventures were checkbooks. Is that correct?

A: Yea, I believe so, yeah . . . everything that Mr. Pisano obtained was all the information that I had given him.

Q: Now, as far as those checking records go, you gave them to Mr. Pisano, correct?

A: Yes.

Q: And he gave them back to you?

A: Yes.

Q: And you destroyed them, correct?

A: I believe so, yes.

Q: So you have no records to refer to, other than to what Mr. Pisano has produced at this point in time, correct?

A: Correct.
. . .

Q: And all of the registers and checks have been destroyed by you. Isn't that correct?

A: Destroyed, whatever—

Q: Well, you discarded them?

A: I—right.  After I did all my taxes, whatever I didn't need, I discarded, yes.[150]

The only explanation for why these records were destroyed or discarded was that he did not believe they needed to be preserved after Pisano reviewed them and filed their tax returns, even though he was involved at that time in this bankruptcy case and these pending nondischargeability actions, as well as at least one other state court action.  In short, the only "justification" offered for the destruction or discarding of these important records was that he did not think he needed them anymore.  But Mr. Kennedy's asserted ignorance is simply not a valid

---

[150] (Trial Tr. 63:20-64:8; 65:10-15, June 12, 2015).

justification for his actions.  Even if it were, it would not apply under the facts here since the Debtors knew or should have appreciated the significance of these documents to the case, especially when they were served with the Plaintiffs' complaint and subpoena in December 2010 and they were involved in various litigations before this Court and the state court.  Those documents were directly relevant and under subpoena, but they were discarded and/or concealed anyway.

The very real harm that was caused by Mr. Kennedy's admitted destruction or "discarding" of all the business records he turned over to his accountant when they were returned to him was compounded on the very next trial day, June 15, 2015.  Then, Mr. Kennedy suddenly produced a portion of the S&S check registry (missing sixteen months) that he had testified had been destroyed or discarded just three days earlier, resulting in another false oath and a separate violation of section 727(a)(4) as discussed below.

Here, the colloquy between counsel, Mr. Kennedy, his counsel and the Court is material and revealing.  On redirect on June 15, 2015, when Mr. Kennedy was being questioned regarding the issues with the Oppenheimer account, Mr. Kennedy produced for the very first time in five years of litigation, a portion of the check registers which he testified had been destroyed just three days earlier.

| THE COURT: | I know. And that's P49. Right? |
|---|---|
| MR. BONANNO: | Well, no. It's the -- P49, yes, is in the book. *But he has a separate ledger that he [Kennedy] told me he found three or four months ago*, which he went back, and looked at, and saw he could now answer where these different deposits came from. |

*    *    *

| THE WITNESS: | This ledger book is basically everything that the accountant was given. |

40

| MR. BONANNO: | The documents are the same as was given to us by Mr. Romans on P49.  *It's the ledger, the check register that he [Kennedy] never had.* |
|---|---|
| THE COURT: | But Mr. -- okay. Mr. Romans never had that. |
| MR. BONANNO: | That's correct. And we're not putting it into evidence. We're just -- he's just going to now refresh his recollection and say where each of the deposits came from, from what source.[151] |

This testimony demonstrates that Mr. Kennedy testified falsely on June 12, 2015 when he stated that he had destroyed or discarded all the documents that he had given his accountant, which was in and of itself a material violation of 727(a)(3) and (4).   This testimony also demonstrates that Mr. Kennedy: (i) failed to produce this extremely relevant information when it was under subpoena; (ii) that he had "found" the allegedly destroyed document "three or four months ago" and failed to produce it at that time; and (iii) produced it at trial on June 15, 2015 only when he wanted to support and/or supplement prior testimony (from June 12, 2015) that Mr. Kennedy and/or his attorney apparently felt was incomplete and/or potentially harmful.

The harm here was further amplified by the fact that the Debtors produced virtually nothing in discovery, forcing the Plaintiffs to attempt to reconstruct the Debtors' unorganized and complicated financial history by subpoenaing documents from third parties.   As was stated by Plaintiffs' counsel:

| MR. ROMANS: | Your Honor, I did just want the Court to understand that we were not given any documents at all in this case, other than the foreclosure complaints that Mr. Bonanno gave me. All of these records that I obtained, I had to subpoena from banks. This ledger sheet should have been produced and given to me in discovery. . . . [152] |
|---|---|

Plaintiffs' counsel was correct that the check register should have been produced in discovery, but was not.  The concealing of the register sheet until the sixth day of a  nine-day trial,

---

[151] (Trial Tr. 102:1-21, June 15, 2015) (emphasis supplied).
[152] (Trial Tr. 103:9-15, June 15, 2015).

when Mr. Kennedy allegedly "found" it three or four months prior and allegedly destroyed or discarded it long before, is by itself a section 727(a)(3) violation.  And although knowledge is not an element of section 727(a)(3) violation, the Court finds that this was a knowing and admitted violation since Mr. Kennedy first admitted the destruction or discarding of these documents and then did not produce the ledger until he thought it could benefit him at trial, even though he had "found" it months before.  And even when finally produced, it was missing approximately sixteen months of checking transactions.[153]   No other documents or check registers, including those related to 447 Van Houten or Lircostew, were produced or found by the Debtors, in whole or in part.   There is and can be no justification for this conduct, and none was offered.   Any other documents that Mr. Kennedy may have actually destroyed or discarded, as per his own testimony, give rise to separate violations of section 727(a)(3).

### C.  11 U.S.C. § 727(a)(4)[154]

Section 727(a)(4) provides that the Court shall grant a debtor a discharge unless:

> (4) the debtor knowingly and fraudulently, in or in connection with the case—
>
> (A) made a false oath or account;
>
> (B) presented or used a false claim;
>
> (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or
>
> (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs.

---

[153] (D-1).

[154] Plaintiffs did not expressly plead the section 727(a)(4) claims as causes of action in their Complaints, although they were included in the demands for relief in the Lira and Ruiz Complaints.  However, the Plaintiffs' section 727(a)(4) claims were expressly (and extensively) raised at trial and in the Plaintiffs' pre- and post-trial submissions (including summary judgment motions and cross-motions) without objection.   Thus, the Complaint is deemed amended pursuant to FED. R. CIV. P. 15(b)(2), made applicable here by FED. R. BANKER. P. 7015, as an issue tried by express or implied consent of the parties.

11 U.S.C. § 727(a)(4).   The elements of a claim under this section are: "(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently."[155]   Signing the petition and certifying that the statements therein are true under penalty of perjury constitutes an oath under this section.[156]   A material omission can also be a false oath.[157]   Fraudulent intent can be inferred where no reasonable explanation for the omission is provided.[158]

A false oath or omission is material if it relates to assets or transactions relevant to creditors.[159]   A false oath or omission can result in denial of discharge even if it does not result in a loss of value to the estate if it adversely affects creditors' ability to investigate the debtor's financial affairs.[160]   While careless mistakes in filling out the petition may be insufficient to bar discharge, a pattern of false statements evidencing a "reckless indifference to the truth" can satisfy the intent element of a claim under this section.[161]

Here, the Debtors amended their bankruptcy schedules seven times.[162]   Many, if not all, of the amendments were made only after the omissions or inaccuracies were pointed out to Debtors.   While the sheer fact that seven amendments were necessary is strongly suggestive of

---

[155] *In re Retz*, 606 F.3d 1189, 1197 (9th Cir. 2010).

[156] *In re Grondin*, 232 B.R. 274, 276 (B.A.P. 1st Cir. 1999); *In re Beshears*, 196 B.R. 468, 476 (Bankr. E.D. Ark. 1996) (false statement includes false testimony during the section 341 meeting);  *In re Gannon,* 173 B.R. 313, 320 (Bankr. S.D.N.Y. 1994); *see also* FED. R. BANKR. P. 1008.

[157] *In re Ingle,* 70 B.R. at 983 ("A material omission from a debtor's sworn statement of affairs or schedules presents grounds for denying a discharge under 11 U.S.C. § 727(a)(4)(A)").

[158] *In re Murray,* 249 B.R. 223, 228 (E.D.N.Y. 2008).

[159] *In re Beaubouef*, 966 F.2d 174, 178 (5th Cir. 1992) (to be material an omission need not relate to value of omitted asset but rather the omission must merely be related to "the bankrupt's business transactions or estate, or concern[ ] the discovery of assets, business dealings, or the existence and disposition of property"); *Williams v. Hoza (In re Hoza)*, 373 B.R. 409, 416 (Bankr. W.D. Pa. 2007).

[160] *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984) ("The recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless business relationship or holding; such a defense is specious . . . Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them"); *DeAngelis v. Williams (In re Williams)*, 2012 Bankr. LEXIS 3804, *24 (Bankr. M.D. Pa. Aug. 17, 2012).

[161] *In re Kinard*, 518 B.R. 290, 306 (Bankr. E.D. Pa. 2014); *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685-86 (6th Cir. 2000).

[162] (See Am. Schedules ECF Nos. 1, 7, 43, 48, 58, 69, 92, 107, 117).

intent to conceal assets, or at least a reckless disregard for the truth and the Debtors' obligation to make full and candid disclosure, the amendments reveal a troubling pattern in which the Debtors would fail to disclose certain assets, the Plaintiffs would discover or bring those assets to the attention of the Court, and the Debtors would file amendments to schedules disclosing those assets. Further, the Debtors' explanations for why the assets were omitted were often unclear or unsupported by any facts. The most glaring inaccuracies are discussed below.

### 1.     Oppenheimer & Co. Account

As was noted above, the omission of the Oppenheimer account from the schedules was a false oath, as was the statement in the amendment that the Oppenheimer account was a "closed account." The Debtors also failed to schedule a closed stock brokerage account with Smith Barney in Mr. Kennedy's name, although they later disclosed it in an amendment.

As discussed above, the Debtors failed to offer a reasonable justification for why the Oppenheimer account was not initially disclosed. The Debtors also offered no explanation for why the Oppenheimer account was subsequently described as a closed account, especially when Mr. Kennedy made withdrawals from that account both shortly before filing for bankruptcy protection and shortly *after* amending his Statement of Financial Affairs to list the account as closed. In short, this Court finds that the main reason for Debtors' failure to offer a satisfactory explanation for these omissions and inaccuracies is that one does not exist.

### 2.     40 Sleepy Hollow

As was also noted above, the Debtors made numerous false and inexplicably inaccurate statements related to 40 Sleepy Hollow, which was originally not even scheduled by the Debtors, even though it was titled in Mr. Kennedy's name (with Federico), is located on the same block as the Kennedys' home and Mrs. Kennedy's mother *and* grandmother lived there. After the omission was discovered by Plaintiffs' attorney, the Debtors amended their schedules several times, adding: "Refinanced by Anne Tederico [sic], mother-in-law, after filing of petition.

44

Previous mortgages paid by refinance after debtors removed from deed."[163]  The Kennedys both testified at trial that Federico refinanced the property.[164]  However, the Plaintiffs produced a title search, dated November 11, 2013, which shows that the last and only outstanding mortgage against the Property was a $417,000 mortgage from Mr. Kennedy and Federico to MERS, dated June 14, 2007.[165]  There was no subsequent refinance, nor was there any evidence that both Debtors were owners of this property, or that there were multiple mortgages.  Other than their testimony, the Debtors provided no evidence that 40 Sleepy Hollow was in fact refinanced.  This testimony was knowingly and materially false.

### 3.    Anne Federico

Anne Federico is not scheduled in the Debtors' bankruptcy filings, either as a co-debtor or an insider-creditor of the Debtors.  However, Federico was a co-debtor on the mortgage for 40 Sleepy Hollow, and she loaned money for the Palmer Street project that was not paid back.  The Debtors explained that they did not list Federico as an insider because they only considered insiders to be those involved as owners in the real estate projects.  They also stated that they listed Federico "under our unsecured debt."[166]

The Debtors' claimed lack of knowledge as to who is an insider is not excusable given that the Statement of Financial Affairs expressly defines "insider" to include "relatives of the debtor."  The Debtors' indication that they had not made any payments to insider-creditors in the one year preceding the petition was false since a $300 check from the S&S Development account was written to Federico with the notation "40 SH" less than two months before the petition.  It is

---

[163] (P-48).
[164] (Trial Tr. 107:19-25, June 10, 2015); (Trial Tr. 27:9-18, June 12, 2015).
[165] (See P-55).
[166] (Debtors' Cert. in Opp'n to Summ. J., at 6-7, ¶¶ 14 and 19, Adv. No. 10-02634, ECF No. 53).

not clear what is meant by the Debtors' statement that Federico was listed "under our unsecured debt" since she was not scheduled at all in the petition and related filings.[167]

### 4.    Howard Street Construction Loan Proceeds

This Court finds that Mr. Kennedy gave false testimony in connection with the use of the proceeds of the construction loan obtained by Ruiz for Howard Street, as was explained in more detail above.  William Cunningham testified that he did not receive a substantial portion of the funds Kennedy asserted were paid to him as general contractor for the project and that his signature was forged on many of these checks.

Kennedy argued that the testimony regarding the forging of his signature on the checks is inconclusive because Cunningham was unable to identify who was responsible for his signature.[168]  But the checks were written from the S&S Development account, over which Mr. Kennedy had exclusive check-writing authority.   Further, as was noted above, when Mr. Kennedy belatedly provided the partial check register, his explanation of the items that were used on account of Howard Street was contradicted by the data on many checks which indicated that they were cashed by other parties for payment of the Kennedys' personal or other, non-Howard Street-related properties and expenses.  Finally, even with the check register and the (at least inconsistent) attribution of the use of the loan proceeds, Mr. Kennedy was not able to account for all the construction loan proceeds.[169]

### 5.    Failure to Disclose Business Interests

The Debtors did not schedule their interests in any of their businesses in their initial filings even though questions 13 and 14 of Schedule B ask debtors to itemize all "[s]tock and interests in incorporated and unincorporated businesses" and "interests in partnerships or joint

---

[167] (Pet., Main ECF No. 1, and P-48, Amendments).
[168] (Debtors' Post-Trial Br. at 10, Adv. No. 10-02635, ECF No. 64).
[169] See Pls.' Post-Trial Summation at 66-70, Adv. No. 10-02633, ECF No. 92 (detailing personal items paid from Howard Street loan proceeds, information and Cunningham testimony).  (See also P-18).

ventures." The Debtors also failed to list their involvement in any of these entities in response to question 18 of the Statement of Financial Affairs, which asks for the disclosure of any businesses in which they were involved in a management role within six years of the filing of the case. The Debtors eventually added six businesses to their petition in an amendment.

The Debtors argue that, although not named in the petition, the businesses were effectively scheduled since the debts that applied to them were listed. They also argued that the businesses were defunct and would not have resulted in value to the estate, and thus their omission was immaterial and that they subsequently amended their schedules to include certain of these as noted above.

But the existence of these businesses was material to creditors seeking to trace the use of their investments. Especially in light of the commingling of funds between projects and business and personal expenses, the lack of disclosure presented an additional obstacle for those seeking to understand the Debtors' financial history. The lack of disclosure as to their business interests is consistent with the Debtors' pattern and practice of failing to disclose and/or to properly and accurately disclose pertinent matters regarding their assets, liabilities and financial condition until their failures were pointed out to them (requiring seven amendments to other schedules and Statement of Financial Affairs) and then asserting that the repeated failures did not matter. These repeated failures do matter and demonstrate intentional and/or reckless indifference to the truth sufficient to establish fraudulent intent and fraudulent conduct.[170]

### 6.    False Statements Regarding Business Records

As was explained in detail above, in response to the Plaintiffs' subpoena, the Debtors indicated that many of the documents requested were in the possession of Pisano and that they were subsequently destroyed or discarded after being returned to Mr. Kennedy. However, at trial Mr. Kennedy admitted that the check register (albeit incomplete) was in fact in his possession at

---

[170] *In re Kinard*, 518 B.R. at 305.

the time the documents were requested and this litigation was ongoing and were allegedly found

by Mrs. Kennedy at a later date, as noted above.[171]    Further, the fact that the documents may

have been with their accountant should not and in fact did not prevent the Debtors from making

copies of them and turning them over to Plaintiffs, as demonstrated by Mr. Kennedy's belated

turnover of the partial check register.[172]    Thus, this Court finds Mr. Kennedy's statements under

oath at trial regarding the destruction and status of the subpoenaed documents were knowingly

false and made with intent to deceive and that Mrs. Kennedy knew or should have known that

the documents she "found" should have been immediately turned over to the Plaintiffs.

### 7.    Conclusion

The inaccuracies and false statements in connection with this case are, at worst, evidence

of the Debtors' intent to defraud creditors, or, at best, evidence of extreme recklessness with

respect to the obligation to truthfully and accurately disclose assets on the petition.  Further, this

Court finds that particularly with respect to the check register, Mr. Kennedy withheld from the

Trustee and Plaintiffs recorded information, including books and records, relating to his property

and financial affairs.   Because either state of mind satisfies the intent element of sections

727(a)(4) and 727(a)(7) (as to Federico, an insider) and Kennedy failed to adequately explain

these false statements, he will be denied a discharge under these sections as well.

### D.    Mrs. Kennedy's Liability for Section 727 Claims

Although  Mrs.  Kennedy  considered  herself  her  husband's  business  partner  and

authorized him to purchase properties in her name and sign her name on checks and other legal

documents, she defended against the Plaintiffs' claims by stating that she never inquired into and

had  no  knowledge  of  her  husband's  business  dealings.[173]    If  true,  this  would  weaken  the

---

[171] (Trial Tr. 108:6-8; 109:24-111:3, June 15, 2015; Trial Tr. 6:9-8:3; 31:7-11, Sept. 23, 2015).
[172] See Bankruptcy Rules 2004 and 9016 (requiring turnover of documents and information in party's possession, custody or control).
[173] (Trial Tr. 65-67, Apr. 17, 2014) (quoting from Mrs. Kennedy's deposition).

inference of fraudulent intent created by the concealment and nondisclosure of assets on the petition and schedules. However, liability may be found where the spouse claiming innocence was involved in the business or related transactions or participated in the benefits of those transactions. In other words, more than the marital relation is needed to impute liability when "innocent spouse defense" is asserted. Additionally, liability may be imputed under a partnership or agency fraud theory.[174]

Here, both Mrs. and Mr. Kennedy considered themselves partners in their business, used the S&S Development account for business and personal purposes and both reaped the benefits of their business. Moreover, Mrs. Kennedy's testimony concerning her involvement and knowledge of the business was at times evasive and contradictory. For instance, during cross-examination, Mrs. Kennedy responded to the question of whether she participated in the real estate businesses by stating: "No. I found out about them after the fact. I never had anything to do with any business ventures, never went to any meetings, no."[175] However, Mrs. Kennedy subsequently admitted participating in various transactions and closings, including the one in which she (and her husband) received the benefit of $140,675.04 as a result of the settlement of the foreclosure action with respect to the Palmer Street property. Although Mrs. Kennedy initially testified that she did not recall attending the Palmer Street closing, she testified on cross-examination that she remembered attending the closing and signing many documents.[176] That Mrs. Kennedy was at least occasionally involved in the business is also demonstrated by her

---

[174] *In re Antonious*, 358 B.R. 172, 184 (Bankr. E.D. Pa. 2006) ("[F]raud pursuant to 11 U.S.C. § 523(a)(2)(A) can be imputed between spouses based on agency principles when there is evidence that the 'innocent' spouse was involved in a business relationship with the 'wrongdoing' spouse that gave rise to the debt") (internal citations omitted); *In re Tsurukawa*, 287 B.R. 515, 521 (B.A.P. 9th Cir. 2002) (finding spouse liable where she had partnership with debtor/husband and helped spend the funds generated through the fraud); *see also In re Copeland*, 291 B.R. 740, 769 (Bankr. E.D. Tenn. 2003) ("[t]here is no doubt that a marital person [might] be authorized to act for the other spouse, but [that] authority . . . will not be implied from the marital relation.")
[175] (Trial Tr. 21:25-22:24, June 10, 2015).
[176] (Trial Tr. 109:9-16, June 10, 2015).

email correspondence with Cristobal around the time of the closing of the Palmer Street settlement.

Mrs. Kennedy also initially testified that she knew that the S&S Development account existed, but did not know where it was kept and never used it.[177]  She further testified that the S&S Development account was intended for business purposes only, and was not intended or authorized to be used to pay personal expenses.[178]  But on cross-examination, she later admitted writing numerous checks for personal and family expenses from the account between 2006 and 2010 and occasionally making entries in the check register.[179]  Mr. Kennedy also identified his wife's signature on various checks for family expenses from the S&S Development account.[180]  Mrs. Kennedy also wrote checks payable for business expenses on the predecessor account with Valley National Bank, reported significant income from the real estate business during good years on her tax returns, and received large tax refunds for losses after 2008.[181]

Finally, this Court finds Mrs. Kennedy's conduct in connection with the Palmer Street closing demonstrated her knowledge of, involvement in, and benefit from that transaction.  This is particularly true as to her assurances to a desperate Cristobal that she would be paid at almost precisely the same time as Mrs. Kennedy was signing the closing documents relating to the sale of that property that would result in $40,000 of proceeds to her and Mr. Kennedy and more than $100,000 going to the Kennedys' attorney, Gruhin, while Cristobal received nothing.  Accordingly, this Court finds that Mrs. Kennedy's conduct towards Cristobal further demonstrates not only her direct involvement in the real estate business, but also her participation in the benefits of that business and her knowledge of Mr. Kennedy's wrongful and/or fraudulent conduct.

---

[177] (Trial Tr. 22:11-24; 26:5-24, June 10, 2015).
[178] (Trial Tr. 28:17-22, June 10, 2015).
[179] (Trial Tr. 45:11-18; June 10, 2015).
[180] (Trial Tr. 75-76; Sept. 23, 2015).
[181] (P-54, 2007 Tax Return); (Trial Tr. 49:13-53:23, June 10, 2015).

Mrs. Kennedy's knowledge of and involvement in the businesses -- even though it was not as extensive as Mr. Kennedy's -- means that she also bears responsibility for the false statements and omissions in the petition and during the course of this case, as well as the Debtors' failure to maintain or preserve adequate books and records and produce documents relating to their financial condition and transactions.[182] Even if she had limited knowledge of the affairs of the real estate assets held in her name prior to the petition, this does not relieve her of her obligation to understand and accurately disclose her interests and obligations upon deciding to file for bankruptcy.[183] While Mrs. Kennedy seeks to discharge millions of dollars in liabilities, she admitted she did not examine the petition and supporting documents in detail.  Her failure to take reasonable care in disclosing assets, especially after the accuracy of the schedules became an issue in this case, was not justified.

Mrs. Kennedy also shares accountability and responsibility for the failure to preserve adequate business records.  Each time Mrs. Kennedy signed her name, or allowed her husband to sign her name in a loan or real estate transaction, creditors were entitled to rely on her promise to repay and the availability of her assets in the event of default.  She had a duty to make records regarding the assets and transactions made in her name available to creditors and failed to do so.[184]  It would be unfair to creditors if she were permitted to avoid her duty to make her financial history available to creditors by pleading total ignorance of her husband's business dealings, particularly where the proofs demonstrate that she was involved in and directly

---

[182] *Sonders v. Mezvinsky (In re Mezvinsky)*, 265 B.R. 681, 701 (Bankr. E.D. Pa. 2001) ("[i]t is not for this Court to pass judgment on how the Debtor chose to manage her financial affairs prior to this bankruptcy case. However, when she filed for bankruptcy relief and invoked the protection of this Court, she forfeited the right to remain ignorant of the disposition of her assets").

[183] (*Id.; see also David v. Annapolis Banking & Trust Co*., 209 F.2d 343, 344 (4th Cir. 1953) ("[a] wife who allows her husband to do business in her name and signs without question any sort of paper that he presents to her is not entitled to a discharge in bankruptcy merely because she has relied upon him where she signed a statement as to her financial condition with reckless indifference to the facts without examining the available source of knowledge which lay at hand, and with no reasonable ground to believe that it was in fact correct").

[184] *See In re Tanglis*, 344 B.R. 563, 569, 572 (Bankr. N.D. Ill. 2006).

benefited from the business, and the S&S Development account.  Thus, Mrs. Kennedy is not entitled to a discharge under section 727(a)(3).

For the same reasons, Mrs. Kennedy shares direct responsibility for making many of the false oaths in the amended schedules and failing to preserve records, particularly as they related to both S&S Development account and 40 Sleepy Hollow.[185]  The false statements and omissions in the Debtors' bankruptcy filings were made by both Mrs. Kennedy and Mr. Kennedy with knowledge of their falsity and/or at least a reckless disregard for the truth.  Therefore, Mrs. Kennedy is also denied a discharge under sections 727(a)(4) and 727(a)(7) (as to Federico, an insider).

## II.    Section 523 Claims

Because the Debtors will not receive a discharge under section 727, evaluation of the Plaintiffs' claims under section 523 is technically not necessary, since their claims will not be discharged.  However, for the purposes of making a full record and establishing the amount, if any, of the Plaintiffs' damages, the Court will address these claims below.

### A.    Cristobal Complaint

Cristobal asserts that her claim for $155,037 (plus attorneys' fees) is nondischargeable under sections 523(a)(2)(A), (4) and (6).

#### 1.    11 U.S.C. § 523(a)(2)(A)

A debt is nondischargeable under section 523(a)(2)(A) if it is obtained by false pretenses, a false representation, or actual fraud.  To prevail on a claim under this section a creditor must show:

> (1) the debtor obtained money, property or services through a
>     material misrepresentation;

---

[185] The Court, however, does not believe that Mrs. Kennedy was responsible for false oaths, including those relating to the Oppenheimer account.  However, the recklessness or outright falsity of the statements as to the S&S Development account, 40 Sleepy Hollow and the various business entities in which Mrs. Kennedy held an interest is sufficient to find section 727(a)(4) violations as to Mrs. Kennedy.

> (2) the debtor, at the time, knew the representation was false
> or made with gross recklessness as to its truth;
>
> (3)  the debtor intended to deceive the creditor;
>
> (4)  the creditor [justifiably] relied on the debtor's false
> representations; and
>
> (5) the creditor sustained a loss and damages as a proximate
> result of the debtor's materially false representations.[186]

At trial, and as described above, Cristobal proved by a preponderance of the evidence that her investment in Palmer Street was obtained by false pretenses because: (1) Mr. Kennedy obtained the $150,000 investment by misrepresenting that her loan was all that was needed to complete the project, that her investment would be used for that purpose and that her loan would be secured by a mortgage on the property; (2) he knew that these representations were false or made it with gross recklessness as to their truth; (3) he intended to mislead Cristobal to obtain her investment; (4) Cristobal justifiably relied on Kennedy's misrepresentations since she would not have made the loan had she known it would not be used on Palmer Street, or if it was not secured by a mortgage on that property; and (5) Cristobal suffered damages.

Mr. Kennedy's defense to Cristobal's claims is that he did not defraud her because she initially approached him about investing in the project.  But even if Cristobal initially approached Kennedy about investing in this project, that has nothing to do with whether her loan was obtained through misrepresentations about how it would be used or secured.  Mr. Kennedy also argues that Cristobal was negligent or partially responsible for failing to obtain a lawyer to represent her interests in the initial financing transaction and later on when the Palmer Street property closed.  Cristobal testified that Mr. Kennedy told her no attorney was necessary, that his

---

[186] *In re Cohen*, 191 B.R. 599, 604 (D.N.J. 1996), *aff'd* 106 F.3d 52 (3rd Cir. 1997), *aff'd Cohen v. de la Cruz*, 523 U.S. 213 (1998); *Field v. Mans*, 516 U.S. 59, 72-75 (1995).

attorneys would take care of the documentation, and that she trusted Mr. Kennedy to properly document the transaction and her security.

In these regards, the Court credits the testimony of Cristobal, rather than Mr. Kennedy, particularly based on the circumstances of their relationship, as described above; i.e., Mr. Kennedy was her supervisor, openly ran an apparently successful real estate business from the Passaic Police Station and lived a high lifestyle.   In these circumstances, the Court also finds Cristobal's reliance on Mr. Kennedy's representations was justifiable. Further, although Mr. and Mrs. Kennedy's conduct relating to the sale of the Palmer Street property is not directly relevant to the initial extension of credit, this Court finds this testimony and conduct to be relevant for other reasons.

In short, at a time when Cristobal was in dire financial straits and pressing Mr. Kennedy and her good friend, Mrs. Kennedy, for payment, she was assured by Mrs. Kennedy, Mr. Kennedy and Gruhin, the Kennedys' attorney, that payment would be forthcoming in connection with the imminent sale of the Palmer Street property.   Instead, the payment of a substantial portion of the net proceeds of the closing of the sale of the Palmer Street property went to Mr. and Mrs. Kennedy ($40,000), their attorney Gruhin (more than $100,000) and the Colons ($110,000), while Cristobal received nothing.   The Court finds this conduct demonstrates both Kennedys' involvement in their real estate business and the scheme to avoid paying Cristobal with the proceeds of the sale of the Palmer Street property that she believed secured her mortgage.   The use of those sale proceeds for their personal benefit without repaying Cristobal was, in this Court's view, in furtherance of the fraudulent conduct that led to Cristobal's loan in the first place.   By their conduct, the Kennedys, including Mrs. Kennedy, who was the obligor on the note, convinced Cristobal to wait on repayment and delay legal action (i.e., an extension of credit and forbearance), at a time when she could have received at least a substantial repayment of her loan.   In sum, if required to determine whether Cristobal's debts were dischargeable under

11 U.S.C. § 523(a)(2)(A), for this or any future proceeding, this Court would find that they are not dischargeable against either Debtor.

## 2.  The Amount of Cristobal's Claim

Cristobal presented evidence at trial that the total amount of damages she suffered as the result of her $150,000 loan was $230,037, as of December 2011. Cristobal thereafter received $75,000 in settlement of a related claim against a third party, leaving a balance due of $155,037.[187]

The Debtors do not directly contradict or challenge these calculations. Instead, they note the $75,000 settlement payment and the $12,500 paid to her by the Kennedys and generally assert that neither Kennedy is liable to Cristobal. However, this Court has already found that the Kennedys are not entitled to a discharge generally under section 727 and that Cristobal's loan is not dischargeable under section 523(a)(2)(A). Further, Cristobal's damage calculation gives credit for the $75,000 plus $12,500 payments. Thus, this Court accepts Cristobal's damages calculation and awards judgment to Cristobal and against the Debtors in the amount of $155,037, plus interest at the legal rate (under State Court Rules) from January 1, 2012 going forward.

## 3.  11 U.S.C. §§ 523(a)(4) and (6)

Section 523(a)(4) renders nondischargeable any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). Given the Court's prior findings and rulings, there is no need to address this claim. However, the Court does not believe that Cristobal provided sufficient proof that Mr. Kennedy (or Mrs. Kennedy) was acting as a fiduciary with respect to her or that he embezzled or stole money from her as those terms are commonly understood and construed under section 523(a)(4). Similarly, there was no proof of willful or malicious injury to Cristobal's property or person, as required by 11

---

[187] (P-44 and supplement).

U.S.C. § 523(a)(6).  Cristobal's actual claim -- and the one she proved at trial -- was for fraud, false pretenses and false representations under section 523(a)(2)(A).

### B.    Ruiz Complaint

Ruiz also seeks a determination that the Kennedys' obligations to him in the amount of $595,101.45 are nondischargeable under sections 523(a)(2)(A), (4) and (6).  Much like Cristobal, Ruiz believed that his separate loans and investments with respect to the Third Street and Howard Street properties would be used in connection with the acquisition and development of those properties.[188] As to the Howard Street property, the loan documents themselves admittedly required that the construction loan proceeds would be used in connection with that property.[189] The proofs showed otherwise.

### 1.  Third Street

As to the Third Street property, at the time of making his $100,000 loan that he thought was secured by a mortgage, Ruiz was unaware that the property was purchased with the proceeds of that $100,000 loan *and* a $200,000 mortgage loan from Norman Barna that was recorded prior to Ruiz's mortgage.  Ruiz thought he was the sole lender.[190]  There was also a mortgage of approximately $250,000 on this property given to Fadi Samaan that was also recorded prior to Ruiz's mortgage.[191]  The Barna mortgage went into default after Ruiz's mortgage was belatedly recorded and Barna commenced a foreclosure action.  As a result, Ruiz was named as a defendant in that action based on his later recorded mortgage.

The evidence produced at trial showed that proceeds of the $100,000 loan from Ruiz were deposited by Mr. Kennedy into the 447 Van Houten account at Valley National Bank which was to be used exclusively for the 447 Van Houten project.[192]  At the time of this default, the 447

---

[188] (Trial Tr. 29:5-30:2; 33:11-18, Nov. 14, 2013).
[189] *Id.* (P-12, 15 and 16); (Trial Tr. 49:19-25; 50:25-51:5; Sept. 23, 2015).
[190] (P-12).  (Trial Tr. 63:11-20, Nov. 14, 2013).
[191] (P-8 and P-9).
[192] (P-2); (Trial Tr. 72:18-20, Nov. 14, 2013).

Van Houten account was overdrawn by $18,386.81, with the deposit creating a positive balance.[193] Once again, the Debtor's shoddy record-keeping and commingling of funds and personal and business expenses created tracing problems. However, from the records that were available prior to being destroyed or discarded by Mr. Kennedy (including those relating to 447 Van Houten), the analysis prepared by the Debtors' own accountant (Pisano) showed that most, if not all, of the proceeds from Ruiz's loan were used for 447 Van Houten and could not be traced to the Third Street property.[194] Ultimately, as testified by Cunningham (Mr. Kennedy's contractor), the project failed and could not be completed, with about $30,000 of work remaining for which there was no funds available.[195]

Thus, Kennedy's fraud with respect to this loan included both material misstatements as to the use of the loan proceeds, the status and priority of Ruiz's mortgage, including particularly, the existence of prior mortgages in favor of Barna and Samaan. Mr. Kennedy's "defense" that his signature was "forged" on the mortgage and mortgage note in Lira and Mr. Kennedy's name given to Ruiz at the office of Mr. Kennedy's own attorney and witnessed by that same attorney is not a viable or credible defense; instead, it is a further acknowledgement of a knowing and continuing fraud. In sum, the Court finds that Mr. Kennedy's misrepresentations and omissions as to the use of the proceeds of Ruiz's $100,000 loan, and the existence of mortgages that were prior to Ruiz were material and were knowingly made or omitted by Kennedy to induce Ruiz to make the loan. The Court further finds that Ruiz justifiably relied on those misrepresentations and omissions and that they resulted in substantial damages to him. Thus, to the extent this may be relevant to any future proceedings, this Court finds that the debt from Mr. Kennedy to Ruiz relating to the $100,000 would be nondischargeable pursuant to section 523(a)(2)(A).

---

[193] (P-2, Account Statement dated May 31, 2006).
[194] (Trial Tr. 116:22-118:21, March 7, 2014 and P-10, analysis of Van Houten check register). (See also P-16 and Trial Tr. 72:6-73:16, Nov. 14, 2013).
[195] (Trial Tr. 35:16-37:24, Apr. 17, 2014); (Id. at 38:1-25; 28:6-22).

### 2. Howard Street

As was noted above, prior to hearing all of the problems with the Third Street property, Mr. Kennedy and Ruiz entered into another "partnership" with respect to the Howard Street property. Ruiz contributed the $32,500 deposit to acquire the property with a $292,500 mortgage from N.J. Lenders and then took out a $315,000 second mortgage on his home to pay off the N.J. Lenders mortgage. As was acknowledged by both sides, the payoff of N.J. Lenders was necessary to obtain the construction loan financing needed to complete the project.

In fact, the construction loan was obtained from Sun Home Loans and an initial draw of $160,000 was made. After payment of fees and costs, $120,100 was available from the initial $160,000 draw. A check for $120,100 made payable to Ruiz and Mr. Kennedy, was endorsed by Ruiz and deposited into the S&S Development account. Despite Mr. Kennedy's acknowledgement that the Sun Home loan had to be used in connection with the Howard Street property, and Mr. Kennedy's representation to Ruiz to the same effect,[196] which is not what happened. Instead, consistent with the other loans that are the subject of this action, the proceeds were used primarily for other purposes -- business and personal.

The Howard Street mortgage soon defaulted and went into foreclosure. Ruiz and Mr. Kennedy, as guarantors, were sued personally as well. A judgment was entered against Ruiz and his wages were garnished.[197]

Based on the records obtained by Plaintiffs, the analysis prepared by Pisano and the testimony of Cunningham, approximately $28,000 of the proceeds were expended on the Debtors' personal expenses, including income taxes, college tuition, cash, the Kennedys' home pool repair, home mortgage payment and a mortgage payment relating to the 40 Sleepy Hollow property. An analysis of the use of the loan proceeds by Pisano showed that the major part of the

---

[196] (Trial Tr. 49:15-25, Sept. 23, 2015; Trial Tr. 48:23-49:5; 51:5-11, Nov. 14, 2013).
[197] (Trial Tr. 39:2-13, Sept. 24, 2015).

remaining balance --- over $90,000 -- was used for other projects.[198]  Additionally, Cunningham

testified that his signature was forged on two checks made payable to him (for $1,163 (No. 1397)

and $1,543 (No. 1413)) that were cashed at a check-cashing store in Passaic.

As was also noted above, Kennedy's attempt to tie the expenditure of these funds to the

Sun Home loan fails of its own weight as his explanation: (i) did not account for all the funds;

(ii) included funds spent on other projects; (iii) included checks that were cashed by other

nonrelated parties (e.g., Tiger Schulmann, Maria's Sweet Shop); (iv) included payments of

personal expenses; (v) included payments allegedly made to Cunningham over what

Cunningham says was his forged signature that were cashed at Passaic check-cashing facilities;

and (v) added payments attributable to expenses that relate to the period before the loan was

made (e.g., $12,810 paid to the attorney who closed the acquisition of Howard Street from the

Lircostew account).    To add to the continuing misrepresentations, most of Mr. Kennedy's

defense was based on the purportedly destroyed records that he conveniently found (in part) and

belatedly produced at trial.

Based on the evidence adduced at trial, the Court finds that Mr. Kennedy's

representations as to the use of the Sun Home loan proceeds and investments as to Howard Street

property were knowingly false when made and were justifiably relied upon by Ruiz in entering

into the Sun Home loan.  Accordingly, the Court finds Mr. Kennedy's debts to Ruiz as to the

Howard Street property would be nondischargeable under section 523(a)(2)(A).  The Court

rejects as without merit Mr. Kennedy's argument that: (i) Ruiz is only entitled to one-half

damages as his wife was on the deed to their marital property when Ruiz was fully liable on the

underlying obligations; and (ii) Ruiz was somehow responsible for his losses because he "walked

away" from the Howard Street project and did not want to throw good money after bad.  As to

"walking away" from the project, that only occurred after two projects failed, went into

---

[198] (See P-18 and P-66).  (Trial Tr. 22:6-14; 54:1-15, Apr. 17, 2014).

foreclosure, Ruiz had lost hundreds of thousands of dollars and discovered many of Mr. Kennedy's misrepresentations.   Ruiz would have been more culpable for his actions if he continued to loan or advance money to Mr. Kennedy after those events.

As to the extent of his damages, it was Ruiz who was on the notes and mortgages, who was sued and who had his wages garnished.  Thus, it is irrelevant that Mrs. Ruiz was on the deed to their marital home.  Accordingly, to the extent necessary, this Court would find that Mr. Kennedy's debt to Ruiz is nondischargeable under section 523(a)(2)(A).  The Court would also find that Ruiz did not meet his burden of proof with respect to the section 523(a)(4) and (6) claims.  First, the fiduciary standard of section 523 has been limited to express or technical trusts, rather than the fraud of partners.[199]  Further, there was no proof of willful or malicious injury to Ruiz's person or property under section 523(a)(6).  Thus, Ruiz's sections 523(a)(4) and (6) claims against Mr. Kennedy would be dismissed.

This Court further finds that, as was acknowledged by Ruiz, Mrs. Kennedy had no known involvement in the Third or Howard Street property loans and investments and did not personally sign any of the related documentation.  Therefore, she bears no personal responsibility for Ruiz's losses.   Accordingly, to the extent (if any) that this may be relevant to this or any future proceeding, this Court finds that Ruiz did not satisfy his burden of proof to establish that Mrs. Kennedy had any personal obligation to him as to these loans and transactions or that any such personal obligation is nondischargeable.

### 3.   The Amount of Ruiz's Claim

Ruiz is entitled to recover for all his losses, less any appropriate credits.  He submitted a damages calculation that showed losses of $578,101, after giving credit for Ruiz's settlement with a third party ($225,000) and for the proceeds of sale of the Howard Street property

---

[199] See FN 194 and FN 195.

($19,966).[200]   This calculation also includes $75,000 in attorneys' fees paid in connection with

the settlement of $225,000.   However, this Court does not believe that is a proper element of

damages, as under the American Rule each party bears their own legal expenses, unless the

agreement between the parties or applicable law provides otherwise.   Here, there was no

agreement between Ruiz and the third party providing for the payment of legal fees, and none is

alleged.   Thus, unlike the fees requested under the Note and Mortgage ($8,000, according to P-

25(a)), which are part of the agreement between Ruiz and Mr. Kennedy, the $75,000 is not

properly recoverable against Mr. Kennedy.   Accordingly, the $578,101 in damages sought by

Ruiz will be reduced by $75,000.   Judgment will be entered against Mr. Kennedy and in favor of

Ruiz in the amount of $503,101, plus interest at the legal rate (under State Court Rules) from

January 1, 2014 going forward.

### C.        Lira Complaint

Lira seeks a judgment of nondischargeability for fraud in a fiduciary capacity and

embezzlement and willful and malicious injury under sections 523(a)(2)(A), (4) and (6).   The

Debtors argue that Lira's claims are barred under the irrevocable general release.

### 1.   Whether Lira's Section 523(a) Claims are Barred by the Release

The release executed by Lira on October 29, 2007 states, in relevant part:

> Releasors [defined to include Lira] knowingly, voluntarily and
> without duress, do hereby in perpetuity, jointly, severally, and
> irrevocably release, acquit, and forever discharge Releasees [
> defined to include Mr. and Mrs. Kennedy] . . . from any and all
> claims, rights, actions, causes of action, suits, [etc.] . . . from the
> beginning of time to the date of this Release . . . .[201]

Lira executed the release in an individual capacity and in his capacity as a member of 447 Van

Houten, LLC in connection with the settlement of LG Capital's foreclosure action against 447

---

[200] (P-25(a)).
[201] (Debtors' Mot. for Summ. J., Adv. No. 10-02634, ECF No. 45-4).

Van Houten, LLC.  In exchange, and as part of a related series of transactions, LG Capital released Lira from all personal liability on its approximately $9.5 million claim.

A release is binding if it was willingly and knowingly entered into, "unless there is a showing of fraud, misrepresentation or overreaching by the releasee, or a showing that the releasor was suffering from an incapacity affecting his ability to understand the meaning of the release or on any other equitable ground."[202]  Lira argues that the release was obtained through the fraudulent misrepresentation (made by the Debtors and their attorney, Gruhin) that LG Capital required him to release them in order for the settlement to be consummated.  According to Lira, LG Capital did not in fact require such a release.  He also asserts he would not have signed the release had he known that the Kennedys also received $50,000 and a percentage of profits made by LG Capital on 447 Van Houten as part of the settlement.

But Lira admitted at trial that he and his attorney received all of the release documents on October 24, 2007 and that he reviewed them with his attorney prior to signing the release, as is recited in the Release itself.[203]  Lira does not allege that he was in some way prevented from contacting LG Capital to learn what their demands were or from negotiating different terms that would not include his release of the Kennedys.  Other than his own testimony, which was disputed by the Debtors, Lira presented no evidence that the Debtors misrepresented LG Capital's position.  An email from Gruhin dated October 24, 2007 makes it clear that the settlement anticipated that Mr. Kennedy would work with LG Capital to complete the 447 Van Houten project after the settlement, thus further belying any claim that Lira was "duped" into signing the Release.[204]

---

[202] *Wojcik v. Pollock*, 97 N.J. Super. 319, 324 (Ch. Div. 1967).
[203] (Trial Tr. 24:23-25:4, Mar. 7, 2014).  (See also P-56, settlement documents, including Irrevocable General Release by Lira and others in favor of the Kennedys).
[204] (See P-69).

Tellingly, Lira derived a significant benefit from the Release -- a release from liability of $9.5 million or more to LG Capital -- which Lira does not in any way seek to challenge or avoid. It is only the release in favor of the Kennedys that he challenges.  In assessing the fraud and embezzlement claim, the Court also notes that Lira and Kennedy had a long and at one time positive personal business relationship with each other that deteriorated dramatically for various reasons.  In addition to knowing each other very well, the Court finds that, based on the testimony of both Lira and Kennedy and its observation of their demeanor, Kennedy and Lira are savvy, street-smart and toughened parties who know very well how to protect themselves.  By nature of their profession and experience, as police officers and real estate investors/developers, they would approach these types of transactions with a healthy dose of skepticism and sophistication.  In sum, the Court finds that there was no fraud or misrepresentation by Kennedy in connection with the Release and no reasonable reliance by Lira in any event.   Because there is insufficient evidence that the release was obtained through the fraud or misrepresentation of the Debtors, it is binding on Lira and his claims against the Debtors based on conduct that occurred prior to October 29, 2007 are barred.  Lira's claims under section 523(a) are therefore dismissed.

## 2.  11 U.S.C. § 523(a)(4) and (6)

Section 523(a)(4) renders nondischargeable any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4).  Lira also alleges that Kennedy embezzled funds or committed fraud in a fiduciary capacity based on his misuse of funds transferred from 447 Van Houten, LLC and Lircostew, LLC.  But those transfers occurred before the date of the Release and therefore cannot support a claim against Kennedy, as was noted above.  In fact, Plaintiffs' proposed findings of fact and their exhibit P-65 indicate that all the deposits in the Oppenheimer account from 447 Van Houten and Lircostew occurred in 2006, which was prior to the release.  Though somewhat less clear, the same appears to be true as to the Smith Barney account (i.e., all deposits before 2007).  Thus, based on the evidence

63

produced at trial, the Court holds that the broadly worded Release also applies to moneys deposited into the Oppenheimer and Smith Barney accounts by 447 Van Houten and Lircostew and the subsequent transactions in those accounts relating to those deposits. Further, to the extent (if any) that Lira is claiming that his causes of action relate to post-release matters, the Court finds that he did not meet his burden of proof on that issue as a matter of law or fact.

In addition to the Release, Lira's claims as to the alleged transfer of funds from 447 Van Houton and Lircostew are separately barred because Lira assigned his interest in 447 Van Houten to Mrs. Kennedy as part of the Release transaction and thus has no right or standing to bring claims on 447 Van Houten's behalf.[205]   Lira also signed the Release in his capacity as a member of 447 Van Houten, thus barring any claims in that capacity as well. Further, 447 Van Houten was not a party to this action and the funds were contributed to the Oppenheimer account by that entity, not Lira personally.   Thus, he is not the proper party to assert those claims.

As to Lircostew, the Court also finds that Lira's fraud and defalcation claims under section 523(a)(4) are barred because courts have limited the scope of this section to fiduciary duties imposed by express or technical trusts.[206]  Thus, a claim for fraud in a fiduciary capacity does not apply to frauds of partners.[207]  Because Lira was a partner with Kennedy in 447 Van Houten and Lircostew, his fiduciary-based claims under this section also fail on these separate grounds. Finally, as with Cristobal and Ruiz, this Court finds no willful or malicious injury by either Debtor to the property or person of Lira. Thus, his section 523(a)(6) claim would also be denied.

For all these reasons, all of Lira's section 523 claims against Kennedy are dismissed. Although Ruiz dismissed his objection to the Debtors' discharge and this Court has found that

---

[205]  (See P-56 and Proposed Findings at 69-70, Adv. No. 10-02633, ECF No. 91).
[206] *See In re Casini*, 307 B.R. 800, 817 (Bankr. D.N.J. 2004); *In re Angelle*, 610 F.2d 1335, 1339 (5th Cir. 1980) ("[I]mplied or constructive trusts and trusts ex maleficio are not deemed to impose fiduciary relationships under the Bankruptcy Code").
[207] *In re Spector*, 133 B.R. 733, 739 (Bankr. E.D. Pa. 1991).

Lira has no claims against the Debtors, Cristobal's claims against the Debtors and her objection to the Debtors' discharge were sustained. Thus, the Court need not address the issue as to whether Lira had standing to object to Debtors' discharge.

<u>**CONCLUSION**</u>

For all the foregoing reasons, the Court will enter an Order and Judgment as follows:

1.  Sustaining the objections to the discharge of Stewart Kennedy under 11 U.S.C. §§ 727(a)(2)(B), 727(a)(3), 727(a)(4) and 727(a)(7) and denying Mr. Kennedy a discharge;

2.  Sustaining the objections to the discharge of Samantha Kennedy under 11 U.S.C. §§ 727(a)(3), 727(a)(4) and 727(a)(7) and denying Mrs. Kennedy a discharge;

3.  Determining that Mr. and Mrs. Kennedy's debt to Cristobal would also be nondischargeable under 11 U.S.C. § 523(a)(2)(A), that their liability to Cristobal is joint and several, and is in the amount of $155,037, plus interest at the legal rate (under State Court Rules) from January 1, 2012 going forward;

4.  Determining that Mr. Kennedy's debt to Ruiz would also be nondischargeable under 11 U.S.C. § 523(a)(2)(A) and is in the amount of $503,101, plus interest at the legal rate (under State Court Rules) from January 1, 2014 going forward;

5.  Determining that Ruiz has no monetary claims against Mrs. Kennedy with respect to the causes of action raised in his Complaint and those claims are denied;

6.  Determining that Lira, individually and on behalf of 447 Van Houton LLC, released his claims against Mr. and Mrs. Kennedy pursuant to the Irrevocable General Release dated October 29, 2007, from Lira.  Accordingly, Lira's Complaint to determine: (i) that the alleged debts owed to him by Mr. and Mrs. Kennedy under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4) and 523 (a)(6) (Counts I, II and III) are nondischargeable; and (ii) the amount of those debts, is dismissed and

his monetary claims against Stewart and Samantha Kennedy, as set forth in his

Complaint, are denied.

7.      Denying any remaining other claims and causes of action.

An Order and Judgment consistent with this Opinion is being entered by the Court.


                                        /s/ Vincent F. Papalia
Dated: February 8, 2017                 VINCENT F. PAPALIA
                                        United States Bankruptcy Judge